James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,

v.

GREYHOUND LINES, INC., Defendant-Appellant.

No. 73-1214.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 18, 1974.

Decided April 23, 1974.

Rehearing Denied July 25, 1974.

---

L. Norton Preddy, Miami, Fla., Edward J. Wendrow, Chicago, Ill., for defendant-appellant.

Robert J. Corber, Washington, D. C., amicus curiae.

Carin Ann Clauss, Atty., U. S. Dept. of Labor, Washington, D. C., Herman Grant, Dept. of Labor, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, PELL, Circuit Judge, and ESCHBACH, District Judge.[1]

SWYGERT, Chief Judge.

Defendant-appellant, Greyhound Lines, Inc., appeals from a finding that its maximum hiring age policy for applicants for the position of driver of intercity passenger buses violates the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. Pursuant to that policy Greyhound declines to consider applications for intercity bus drivers from those individuals thirty-five years of age or older.[2]

The Government contends that Greyhound's hiring policy violates section 4(a)(1) of the Act, 29 U.S.C. § 623(a)(1), which makes it unlawful "to fail or refuse to hire . . . any individual . . . because of such individual's age." In addition the Government charges that Greyhound's maximum hiring age violates section 4(a)(2) of the Act, 29 U.S.C. § 623(a)(2), which prohibits efforts "to limit, segregate, or classify . . . employees in any way which would deprive . . . any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." Also the Government claims that Greyhound's advertisements indicating age differentiation in employment is forbidden by section 4(e) of the Act, 29 U.S.C. § 623(e).

---

1. District Judge Jesse E. Eschbach of the Northern District of Indiana is sitting by designation.

2. The Act prohibits age discrimination with respect to those persons age forty to sixty-five. 29 U.S.C. § 631.

Greyhound, although admitting the employment and advertising practices charged by the Government, denies that such practices violate the Act in that it is contended that Greyhound's actions are exempted from the Act's proscriptions. Under section 4(f)(1) of the Act, 29 U.S.C. § 623(f)(1), an employer may differentiate as to age without violating the Act if age is shown to be a "bona fide occupational · qualification reasonably necessary to the normal operation of the particular business. . . ." Greyhound contends that its maximum age hiring policy is premised on considerations of public safety and as such constitutes a "bona fide occupational qualification."

At trial Greyhound urged that abolition of its maximum age hiring policy with respect to intercity bus drivers would increase the likelihood of risk of harm due to driver failure and thereby concomitantly impede Greyhound's efforts for safety. The trial judge held that Greyhound had failed to meet its "burden of demonstrating that its policy of age limitation is reasonably necessary to the normal and safe operation of its business." In making this determination the trial judge stated:

> [T]he defendant's policy is not founded on the "factual basis" for its belief that "all or substantially all [applicants over age 40] . . . would be unable to perform safely and efficiently the duties of the job involved."

In appealing from this holding Greyhound presents two issues for our review. Greyhound contends: (1) that the district court imposed an improper burden of proof on it; and (2) that as a matter of law the evidence demonstrates that Greyhound's hiring policy is a bona fide occupational qualification reasonably necessary to the normal operation of its business. We agree.

## I.

The standard for the burden of proof placed on Greyhound by the trial judge was taken from, the Fifth Cir-

cuit's decision in Weeks v. Southern Bell Telephone & Telegraph Co., 408 F.2d 228 (5th Cir. 1969). In that case the telephone company was faced with a charge of sex discrimination for refusing to consider the application of a woman for the position of switchman. As an affirmative defense the telephone company claimed that the sex of an applicant for the position of switchman was a bona fide occupational qualification because of the allegedly strenuous activity of lifting of weights in excess of thirty pounds occasionally required in fulfilling the job of switchman. In discussing the burden of proof cast upon the telephone company the court stated:

> [W]e hold that in order to rely on the bona fide occupational qualification exception an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved. 408 F.2d at 235.

The court denied the telephone company a bona fide occupational qualification exemption, holding that the company had failed to meet its burden of proof. The court declined to indulge in an assumption, "on the basis of a 'stereotyped characterization' that few or no women can safely lift 30 pounds, while all men are treated as if they can." 408 F.2d at 235, 236.

Although the standard for the burden of proof annunciated in *Weeks* may properly be applicable to the circumstances of that sex discrimination case, we find its application inappropriate in the instant action. Unlike *Weeks*, our concern goes beyond that of the welfare of the job applicant and must include consideration of the well-being and safety of bus passengers and other highway motorists. In fashioning the standard of proof in *Weeks*, the Fifth Circuit was not confronted with a situation where the lives of numerous persons are completely dependent on the capabilities of

the job applicant. Accordingly, we find that decision is of no avail in formulating the standard of proof to be imposed in the instant case.

A more pertinent case is the Fifth Circuit's decision in Diaz v. Pan American World Airways, Inc., 442 F.2d 385 (5th Cir. 1971). In *Diaz* Pan American airline was charged with a violation of the 1964 Civil Rights Act because of its refusal to hire male flight cabin attendants solely because of their sex. As an affirmative defense Pan American argued that being a female was a "bona fide occupational qualification" for the position of flight cabin attendant. In an effort to carry its burden of proof, Pan American produced evidence demonstrating: that females were superior in performing the nonmechanical aspects of the job such as reassuring anxious passengers and providing personalized service; that passengers preferred female attendants (the basic psychological reasons for such preference); and that the actualities of the hiring process would make it more difficult to find those few males suitable to attend to the psychological needs of passengers.

In analyzing the standard of proof required of Pan American to establish a "bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise," the Fifth Circuit construed the word "necessary" in the Act to require:

> [T]hat we apply a business *necessity* test, not a business *convenience* test. That is to say, discrimination based on sex is valid only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively. (Emphasis in original.) 442 F.2d at 388.

The court proceeded to characterize the essence of the normal operation of an airline stating that: "The primary function of an airline is to transport passengers safely from one point to another." 442 F.2d at 388. In the court's view Pan American could not establish

that the employment of male cabin attendants would have any impact on its ability to provide safe transportation and accordingly the court rejected Pan American's defense of bona fide occupational qualification. Pan American's basis for excluding male applicants, that they could not cater to the psychological needs of the passengers as adequately as females, was found to be merely "tangential to the essence of the business involved." 442 F.2d at 388.

Similar to the airline industry, the essence of Greyhound's business is the safe transportation of its passengers. Thus we deem it necessary that Greyhound establish that the essence of its operations would be endangered by hiring drivers over forty years of age. To that end we note the decision in Spurlock v. United Airlines, Inc., 475 F.2d 216 (10th Cir. 1972), where, in addressing itself to the validity of preemployment job qualifications for the position of airline pilot alleged to discriminate against Blacks, the Tenth Circuit stated:

> When a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant, the courts should examine closely any pre-employment standard or criteria which discriminate against minorities. In such a case, the employer should have a heavy burden to demonstrate to the court's satisfaction that his employment criteria are job-related. On the other hand, when the job clearly requires a high degree of skill and the economic and human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job-related. *Cf.* 29 C.F.R. § 1607.-5(c)(2)(iii). The job of airline flight officer is clearly such a job. United's flight officers pilot aircraft worth as much as $20 million and transport as many as 300 passengers per flight. The risks involved in hiring an unqualified applicant are staggering.

The public interest clearly lies in having the most highly qualified persons available to pilot airliners. The courts, therefore, should proceed with great caution before requiring an employer to lower his pre-employment standards for such a job. 475 F.2d at 219.

As reflected in the *Spurlock* decision, a public transportation carrier, such as Greyhound, entrusted with the lives and well-being of passengers, must continually strive to employ the most highly qualified persons available for the position of intercity bus driver for the paramount goal of a bus carrier is safety. Due to such compelling concerns for safety, it is not necessary that Greyhound show that all or substantially all bus driver applicants over forty could not perform safely. Rather, to the extent that the elimination of Greyhound's hiring policy may impede the attainment of its goal of safety, it must be said that such action undermines the essence of Greyhound's operations. Stated differently, Greyhound must demonstrate that it has a rational basis in fact to believe that elimination of its maximum hiring age will increase the likelihood of risk of harm to its passengers. Greyhound need only demonstrate however a minimal increase in risk of harm for it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice.

## II.

In an effort to satisfy its burden of proof, Greyhound produced an array of evidence to substantiate its claim for a bona fide occupational qualification. That evidence included testimony by transportation industry officials, former high-ranking officials of the Interstate Commerce Commission, and Greyhound officers. The testimony of these officials, although persuasive in view of their accumulated experience in the transportation industry, is not of itself sufficient to establish a bona fide occupational qualification. In our view we find more compelling Greyhound's evidence relating to: the rigors of the extra-board work assignments; the degenerative physical and sensory changes in a human being brought on by the aging process which begins in the late thirties in the life of a person; and the statistical evidence reflecting, among other things, that Greyhound's safest driver is one who has sixteen to twenty years of driving experience with Greyhound and is between fifty and fifty-five years of age, an optimum blend of age and experience with Greyhound which could never be attained in hiring an applicant forty years of age or over. This compelling evidence in combination with the general testimony of the transportation industry officials adequately demonstrates that Greyhound has a rational basis in fact to believe that elimination of its maximum hiring age will increase the likelihood of risk of harm to the well-being of its passengers and others.

At the outset we note that the thrust of Greyhound's contention and supporting evidence is that the human body undergoes physical and sensory changes beginning around age thirty-five and that these degenerative changes, caused by aging, have a detrimental impact on driving skills. Moreover, these changes are not detectible by a physical examination. The Government admits that these degenerative changes do occur, but contends that they do not affect driving skills because the driver between forty and sixty-five years of age compensates for these changes through increased maturity and driving experience. In addition the Government claims that even though a physical examination of applicants between forty and sixty-five might not detect degenerative changes impairing driving ability, any such infirmities will be detected during the course of the other elaborate functional and psychological examinations conducted by Greyhound in screening intercity driver applicants.

The medical testimony on behalf of the Government reflects the gravamen

of the Government's challenge to Greyhound's hiring practice. According to the Government's medical witnesses an applicant forty to sixty-five years of age should be judged on the basis of his "functional age," that is, his ability and capacity to do the job, rather than his chronological age. When the testimony of the medical experts on both sides is considered, however, it is not clear that functional age is readily or practicably determinable. Moreover, the Government's medical witnesses seemingly admit that chronological age is at least an indicator of driving ability. Even assuming that Greyhound's examinations of driving skills other than the physical examination can adequately screen out degenerative disabilities occasioned by age in the forty to sixty-five age bracket, it is questionable whether Greyhound could practicably scrutinize the continued fitness of such drivers on a frequent and regular basis.

We come now to the nub of Greyhound's contention that its maximum hiring age policy is a bona fide occupational qualification reasonably necessary to mainstay the safety of its operations. Greyhound urges that the impact of the aging process will be magnified by the rigorous physical and mental demands of the extra-board work assignment system to which all new drivers between the ages of forty to sixty-five would be assigned under its seniority system. There are two work categories into which Greyhound bus drivers are classified. The first is the regular run driver who operates those schedules published in Greyhound's timetables. The regular runs are generally regarded by the drivers as more desirable and require the least strenuous work. These runs are bid by the drivers on the basis of a seniority system established in collective bargaining agreements. The remaining work is performed by the group of drivers referred to as extra-board drivers. A newly hired driver, regardless of age or prior experience, goes to the bottom of the seniority list where he is available for assignments from the extra-board. In general the new driver will remain on the extra-board for a period of ten to forty years depending upon the seniority list in the territory in which he is employed.

While on the extra-board the driver is on call twenty-four hours a day, seven days a week with as little as two hours' notice, to take runs that the more senior regular run drivers do not operate. Often these operations involve odd and irregular hours and, frequently, long charter trips outside the territory served by the regular routes of Greyhound, that may last up to thirty days.

At trial there was testimony to the effect that Greyhound's extra-board work is particularly physically and mentally demanding and that it places an unusual amount of emotional stress on the driver and is often disruptive of the driver's routine of living. One of the redeeming aspects of the operation of the extra-board and the seniority system, however, is that it rewards the driver by giving him an opportunity, as he grows older, to solicit the work that he feels he is best qualified to perform. In the earlier years of a driver's employment he is not able to do that for he must accept whatever work is not performed by the regular drivers. The seniority system is highly advantageous as presently constituted for it allows the older, more experienced driver to compensate for his aging by selecting the more attractively and easily performed work.

Greyhound contends that even though an applicant between age forty and sixty-five may satisfactorily perform on the driver qualification examinations so that at the outset he would be entitled to employment, there is no way of telling how safely he will perform for a sustained period of time given the fact that he will be assigned to the arduous tasks involved on the extra-board at a time when his body begins to undergo degenerative changes due to the aging process. The statistical evidence produced by Greyhound lends support to its belief that elimination of the maximum hiring age will increase the risk of harm to its

passengers. That evidence demonstrates that the rigors of the extra-board are such that extra-board drivers, even with the advantage of youth, experience twice as many accidents per million miles driven than that incurred by regular run drivers, namely, 9.79 accidents per million miles as compared with 4.3 accidents per million miles for regular run drivers. With respect to the effect of the aging process on the safety records of Greyhound's drivers, the statistical evidence establishes that despite the offsetting benefits derived through increased experience as a Greyhound driver, the driver accident rate begins to increase at age fifty-five. Likewise, the statistical evidence isolating driver experience illustrates that as a driver's experience with Greyhound increases his accident rate correspondingly decreases, but that this rate reverses and begins to increase after twenty-six years of experience concomitant with the period during which the aging process is operative. In addition, the statistical evidence establishes that Greyhound's safest driver is fifty-five years of age and has sixteen years of experience as a Greyhound driver—two qualities which newly hired drivers between ages forty and sixty-five would never be able to attain during their tenure at Greyhound.

Besides the foregoing statistical evidence, Greyhound directs our attention to a 1972 study sponsored by the Bureau of Motor Carrier Safety of the United States Department of Transportation which supports certain of Greyhound's claims regarding the likely physical and mental capabilities of newly hired drivers age forty to sixty-five on the extra board. The study indicates that its testing results "are consistent with the hypothesis that older drivers become fatigued more quickly and consequently experience [a] greater proportion of accidents after prolonged driving than younger drivers." Similar to Greyhound's experience, the study showed that the percentage of accidents decreased substantially as the bus or truck driver's age increased from age thirty to the age group forty-one to forty-five but then generally increased from the forty-one to forty-five age group to fifty-six years of age. The study's accident analysis indicated that older drivers tend to experience proportionally more of their accidents after about five hours on the road than do younger drivers. The study summary concludes that the "adverse effects of prolonged driving were evidently more pronounced for older drivers (aged forty-five or more) than for younger drivers" and that "older drivers generally showed an earlier decline in psychophysiological arousal than the younger ones and dropped to a lower absolute level of arousal."

■ With respect to the evidence adduced by Greyhound the Government argues that it constitutes mere conjecture and generalized opinion testimony and is not objective data, demonstrating the inability of newly hired drivers between age forty and sixty-five to cope with the demands of the extra-board. The Government concurs in the district court's holding that Greyhound has failed to establish a "factual basis" for its position. We cannot agree. In our view Greyhound's position as to the potential increase of risk of harm which would be incurred by the elimination of its maximum hiring age is well-founded and grounded on an adequate factual basis. Greyhound need not establish its belief to the certainty demanded by the Government and the district court for to do so would effectively require Greyhound to go so far as to experiment with the lives of passengers in order to produce statistical evidence pertaining to the capabilities of newly hired applicants forty to sixty-five years of age. Greyhound has amply demonstrated that its maximum hiring age policy is founded upon a good faith judgment concerning the safety needs of its passengers and others. It has established that its hiring policy is not the result of an arbitrary belief lacking in objective reason or rationale.

The judgment of the district court is reversed.