413 F.Supp. 1230 (1976)
Phillip W. HOUGHTON, Plaintiff,
and
W. J. Usery, Jr., Secretary of Labor, United States Department of Labor, Intervenor-Plaintiff,
v.
McDONNELL DOUGLAS CORPORATION, Defendant.
No. 73 C 14(3).
United States District Court, E. D. Missouri, Eastern Division.
May 14, 1976.
*1231 John J. Schlueter, Rooney, Webbe, Davidson & Schlueter, St. Louis, Mo., for plaintiff.
Gilbert Drucker, Alan M. Serwer, U. S. Dept. of Labor, Chicago, Ill., Donald J. Stohr, U. S. Atty., Joseph B. Moore, Asst. U. S. Atty., St. Louis, Mo., for intervenor-plaintiff.
Veryl L. Riddle, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This matter is before the Court for a decision on the merits after a trial to the Court sitting without a jury. The case at bar was brought pursuant to the Age Discrimination and Employment Act, 29 U.S.C. § 621, et seq., (hereinafter ADEA). The Court being fully advised of the premises hereby makes the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff, Phillip W. Houghton, was born October 1, 1919, and now resides in St. Louis County, Missouri.
2. The Intervenor-Plaintiff is the Secretary of Labor, of Washington, D. C.
3. Defendant, McDonnell Douglas Corporation, (hereinafter McDonnell) is a corporation, organized and existing under the laws of Maryland, having its principal office and place of business in the State of Missouri. At all relevant times, defendant has had twenty or more employees for each working day and each of twenty or more calendar weeks.
4. Defendant McDonnell is engaged in the manufacture and sale of high performance military aircraft to the government of the United States and other foreign states.
5. The high performance aircraft produced by McDonnell include the F-4 Phantom, which is a military fighter aircraft. *1232 This aircraft has been produced by defendant in various models since 1958. During the period since 1960 the F-4 Phantom was almost exclusively the only high performance aircraft in production by the defendant.
6. The F-4 is still in production by the defendant and has the capability, at certain altitudes, of reaching speeds in excess of twice the speed of sound (Mach 2), and is generally flown by a single pilot with a radar observer/weapons officer in the rear seat.
7. Defendant McDonnell also presently produces the F-15 Eagle, which is also a military fighter aircraft similar to the F-4. The F-15 is a single seat high altitude interceptor. The design and technology of the F-15 represents a significant advance over the design and technology employed in the production of the F-4.
8. The F-4 has the following characteristics of performance:
a. It accelerates from zero miles per hour to one hundred seventy (170) miles per hour take-off speed in ten (10) seconds using seventeen hundred (1700) feet of runway, and after gear and flap retraction it can accelerate at a rate of seven hundred eighty (780) miles per hour per minute.
b. It climbs from sea level to an altitude of thirty five thousand (35,000) feet in two and one-half minutes from brake release.
c. In level flight, depending on the altitude and temperature, the aircraft speed may exceed twice the speed of sound (Mach 2), or over two thousand (2,000) feet per second.
d. At maximum level flight speed enclosing on another object on a collision course, the rate of closing speed is one thousand four hundred and forty (1440) miles per hour, or two thousand eighty (2,080) feet per second, or a similar aircraft on a head-on collision course, the closing speed would effectively be two thousand eight hundred and eighty (2,880) miles per hour, or four thousand one hundred and sixty (4,160) feet per second.
e. The aircraft's landing speed is approximately one hundred eighty (180) miles per hour.
9. Defendant McDonnell employs three categories of test pilots: Experimental, Engineering and Production. As of January 1, 1972, defendant listed fifteen test pilots on its test pilot roster, including plaintiff Houghton. Of these pilots, nine were Experimental test pilots, four were Engineering test pilots, one was a Production test pilot, and the last, Houghton, was Chief Production test pilot.
10. Of the three categories of test pilots, the duties of an Experimental test pilot are the most demanding. An Experimental test pilot must be qualified to perform experimental and production testing and must be able to use engineering abilities while performing a series of prescribed tests and maneuvers on new types or research models of aircraft on their initial flights, including:
a. Flights evaluating aircraft performance.
b. Development flights expanding the limits of the aircraft flight or design envelope,[1] or weapons system.
c. High risk flights demonstrating structural integrity, control system modifications, maneuverability, missile/gun firing, etc.
11. An Engineering test pilot is required to pilot test aircraft through a series of prescribed test and maneuver in order to determine compliance with engineering specifications during subsystem development tests such as auto-pilot, flight control, radar and electronic navigation, weapons systems tests, engine tests, and other development flights.
12. A Production test pilot is expected to use engineering abilities while piloting recently assembled production aircraft through a series of prescribed tests and maneuvers in order to functionally evaluate *1233 items such as the air frame, navigation and radar systems, power plant and other items, for final company acceptance before delivery to the customer.
13. A typical production test flight consists of take-off, flight to the testing area and return to the St. Louis airport within a time of approximately one hour and fifteen minutes.
14. In many instances the plane being flown has never been flown before the production test flight.
15. The test pilot flies the aircraft without a co-pilot or other person capable of flying or landing the aircraft.
16. Portions of the flight commonly occur in the vicinity of a major city with the attendant dangers to the general population in the event of an accident or crash.
17. In beginning and ending a production test flight, pilots fly over heavily populated areas of the City and County of St. Louis.
18. During a production test flight, the pilot is required to undergo a brief two to three second acceleration of approximately 5 "Gs"[2] pull up to check the structural integrity of the aircraft, plus one brief pull-up of approximately 4 "Gs" to observe the disengagement of the auto-pilot system.
19. The production test flight also includes in addition to the acceleration tests, a level speed run approaching twice the speed of sound (Mach 2) to verify the integrity of the air frame and proper operation of the engines at supersonic speeds.
20. The Production test pilot is also expected to conduct a radar intercept test which consists of closing upon a friendly target at a rate in excess of one thousand miles per hour. The Production test pilot must also be able to fly over rolling terrain and attempt to maintain a constant altitude of two hundred fifty (250) feet above the earth at speeds up to five hundred fifty (550) miles per hour or eight hundred (800) feet per second.
21. During the production test flight, the pilot is required to perform a great number of tasks ranging from relatively simple to highly complex. The pilot must maintain visual alertness for objects or other aircraft, which may or may not occur while flying above overcast cloud cover and against a constant color sky background, thereby eliminating a horizon reference with a resulting loss of equilibrium. In addition the pilot must monitor, but not simultaneously, approximately twenty different systems aboard the aircraft involving forty different instruments relating to the performance and flight of the aircraft.
22. All test pilots may be called on occasion to conduct ferry flights, the delivery of totally accepted aircraft by the customer, which may involve long flight hours with in-flight refuelings.
23. A Production test pilot must perform his duties under conditions of psychological and physiological stress which may be caused by one or more of the following factors:
a. Factors beyond the pilot's control such as delay in preparation of the aircraft for flight or bad weather, frequently postponed production test flights for hours or days, resulting in frequent reminders by management that there may likewise be delay in meeting delivery schedules.
*1234 b. In testing the air frame and engines during the production test flight, the pilot must approach maximum limit design dynamic pressures during high speed flight and maximum lift coefficient during maneuvering flight at high altitudes.
c. Test flights of such high performance fighter aircraft require an extremely high degree of concentration. Weather conditions may cause concern because of their bearing on the test pilot's ability to complete his mission, and in the event of a long ferry flight for delivery to a customer, to effect a timed rendezvous for in-flight refueling, and to reach and land at his final destination.
d. Immediately following a production test flight, pilots undergo oral debriefings with technical experts lasting up to thirty minutes, and then must make written discrepancy flight reports.
e. At certain times cockpit conditions, in terms of heat and noise, may be quite uncomfortable.
24. After World War II service as a pilot, flying P-51 aircraft, plaintiff Houghton, then 27 years old was employed by McDonnell as an Assistant Aerodynamicist. In 1951, he became a Production test pilot, and in the same year was promoted to Experimental test pilot.
25. At the age of 37, in 1956, plaintiff Houghton ceased his activities as an Experimental test pilot and became Chief Production test pilot, in which position he remained until March, 1972.
26. The position of Chief Production test pilot requires, in addition to the Production test pilot duties, heretofore described, the responsibility for production and flight operations and the functional supervision of Production test pilots.
27. Due to a declining production rate, defendant McDonnell found it necessary to reduce its pilot staff in order to provide each pilot with the amount of proficiency flying required by Air Force Regulation 55-22.
28. In July of that year, plaintiff Houghton was first informed by management of defendant McDonnell of the need to reduce the staff of approximately fifteen pilots and to transfer plaintiff Houghton from that staff. Plaintiff Houghton expressed opposition to such a plan.
29. Plaintiff Houghton was told by defendant's Vice President for laboratory and flight development, William S. Ross, that Houghton would be removed from flight status on December 31, 1971.
30. In 1971, plaintiff Houghton was almost four years older than any other test pilot who had ever flown for defendant McDonnell.
31. Plaintiff Houghton's removal from flying status was made on the above date upon the defendant McDonnell's good faith determination that his continued employment as a test pilot would be an increased safety risk due to plaintiff Houghton's age.
32. The precise timing for the removal of plaintiff Houghton from flight status was required by the necessary reduction in staff due to a declining production rate.
33. The defendant had been trying to persuade plaintiff Houghton to accept a non-flying job for several years due to defendant McDonnell's good faith concern over increased safety risks due to the plaintiff's age.
34. When plaintiff Houghton was advised of his removal from flight status, defendant McDonnell offered him a position as flight safety engineer, supervising the systems engineering section and also tendered another position in the flight simulation department. The plaintiff was also offered the opportunity to pick a suitable job anywhere in the entire company, including its California and Florida facilities.
35. In mid-December of 1971, Vice President Ross asked plaintiff Houghton about his job hunting efforts, and was advised by the plaintiff that both the flight safety and flight simulation jobs were "unacceptable". The plaintiff also stated that he was going to resign from the Company. Vice President Ross urged him to reconsider and gave plaintiff Houghton four weeks vacation and also four weeks leave of absence.
*1235 36. In early March of 1972, plaintiff Houghton told Vice President Ross he had not found employment inside or outside defendant McDonnell and again rejected the flight safety position. Ross stated that plaintiff Houghton could remain in the test pilot department indefinitely, at the same base pay, as manager of Production flight operations (effectively becoming a non-flying Chief Production test pilot). Plaintiff Houghton was unenthusiastic about that suggestion.
37. Although he had not flown since December 31, 1971, plaintiff Houghton's flight pay was not terminated until the end of March.
38. Shortly after the previously discussed March, 1972, meeting, Vice President Ross again suggested the flight safety job, after which plaintiff Houghton reiterated his desire to continue flying. The plaintiff was of the opinion that there was no job which was a "adequate substitute in both job appeal and salary". The only specific job which plaintiff Houghton would "probably accept" was a corporate vice presidency.
39. Plaintiff Houghton became increasingly unhappy and resentful during 1972 as a result of his removal from flight status. His superiors observed that he was becoming a disgruntled employee. The plaintiff conceded that he resented some of the duties assigned to him and refused to perform them. Defendant McDonnell considered his nine months as Manager of Production Flight Operations to be nonproductive.
40. In response to plaintiff Houghton's attitude, defendant McDonnell determined to assign him to a specific productive job. Plaintiff Houghton was told on December 8, 1972, that he was being transferred to the flight simulation department. On December 12, 1972, plaintiff Houghton refused to accept the transfer. His employment was therefore terminated. Following his dismissal from defendant McDonnell, plaintiff Houghton has never made an effort to find another job.
41. Houghton was not discharged because of his age, but was rather discharged due to non-satisfactory performance of his job and his refusal to accept another position for which he was qualified.
42. Notice of intent to file this action was given to the Secretary of Labor within 180 days after the alleged unlawful practice occurred and at least 60 days before the filing of this action.
43. Plaintiff Houghton and intervenor-plaintiff Secretary of Labor brought this suit alleging that defendant McDonnell which had employed Houghton as a test pilot, removed him from flight status, reduced his salary and terminated his employment in violation of the ADEA. Both plaintiffs also charged that defendant discriminated against Houghton "with respect to his compensation, terms, conditions and privileges of employment", because of his age in violation of 29 U.S.C. § 623(a)(1). The Secretary also alleged that defendant McDonnell limited, segregated or classified Houghton in a way which deprived or tended to deprive him of employment opportunities and otherwise adversely affected his status as an employee, because of his age, in violation of 29 U.S.C. § 623(a)(2).
44. Defendant McDonnell admitted removing plaintiff Houghton from flight status because of his age but contended that this action was taken because age is a bona fide occupational qualification (hereinafter BFOQ) reasonably necessary to the normal operation of defendant's business as permitted under 29 U.S.C. § 623(f)(1). Defendant also admitted terminating Houghton's employment but contended that this action was not taken because of his age but was based upon reasonable factors other than age and was "for good cause," as permitted under 29 U.S.C. § 623(f)(3).
45. To aid the Court in determining whether or not age is a bona fide occupational qualification for the job of test pilot, all parties submitted to the Court an abundance of expert testimony and evidence, showing the effect of aging and the relationship of physiological to chronological age. The Court finds no one view of any expert provided by any party to be totally credible. The conclusions of the Court with *1236 regard to the physiological process of aging and its relation to physiological age and chronological age are the result of a synthesis of the Court sitting as the trier of fact.
46. Aging is a loss of function, a loss of ability at a particular time to meet the particular demands of a person's environment. Such changes begin in man in the early twenties, and inevitably result in a progressive deterioration in all physiological functions in all human beings until death. Progressive changes in the human system result as part of the aging process, lessening the functions of the blood vessels, cells and organs. These changes occur in the thirties and increase in the forties to the point that anyone over the age of fifty is showing certain signs of aging, and in general those over the age of sixty can be said to have aged. All organs and systems of the body are subject to this inevitable aging process which ultimately results in death. No one is immune from this aging process although different people certainly are affected at differing rates by the aging process.
47. With the onset of the aging process, certain physiological changes may or may not take place at different times. It may be said that all the following changes will occur to the general population as they age:
a. Reaction time slows and the ability to respond diminishes with regard to complex or new tasks performed under time pressure or other stress.
b. There may be a loss of vision.
c. There is a possibility of reduction of hearing acuity.
d. There are changes in blood vessels which impair function or adaptation to stress.
e. There is a decrease in respiratory function and efficiency.
f. Resistance to fatigue decreases with age, strength will tend to diminish with age, and the basal metabolic rate decreases with age.
48. Such age related deteriorations are not always detected or even detectable. Degenerative changes of the circulatory and nervous systems cause subtle changes in reaction time, memory and personality which may or may not be detectable, but any one of which may gradually predominate and cause mistakes in judgment with regard to vehicle control responsibilities. Some pilots will suffer these changes before the age of sixty.
49. As age increases so does the risk of sudden incapacitation. The progressive deterioration with age of physiological and psychological functions results in the possibility of significant medical defects. The incidence of sudden incapacitation due to these medical defects increases with age, but cannot be predicted with any accuracy in individuals.
50. Plaintiff Houghton testified at the time of trial that he was as fit as he had ever been, but was forced to concede that aging had taken its toll upon him. He stated that he probably could not withstand six or seven "Gs" for as long a period of time as he did when he was in the Air Force and flying a P-51 fighter aircraft. Plaintiff Houghton also stated that he had a tendency to become somewhat more fatigued in his flying during his fifties than he had during his thirties.
51. Plaintiff Houghton uses a darkening agent upon his hair to improve his appearance and bring it more into line with what he considers to be his physiological age, which he considers to be somewhere in the forties.
52. The Court finds from the evidence that functional age, as distinguished from chronological age, cannot be determined with sufficient reliability to meet the special safety obligations which are imposed upon defendant McDonnell Douglas.
53. In the absence of a comprehensive test by which an individual's functional age might be determined, there is no alternative to establishing an arbitrary age limit.
54. The Court finds that defendant McDonnell had reasonable cause, in light of the expert testimony adduced at trial by all parties, to believe that plaintiff Houghton, at age 52, would not be able to perform *1237 safely and efficiently the duties of a Production test pilot.
55. It is clear to the Court sitting as the finder of fact in this bench tried case that age is a bona fide occupational qualification for the job of Production test pilot and that defendant McDonnell had justification for removing plaintiff Houghton as an unacceptable safety risk due to his age of 52.
56. After consideration of the evidence, the Court finds that plaintiff Houghton's termination from employment was due to the attitude of plaintiff Houghton upon his removal from flight status, and was not in any way based upon plaintiff Houghton's age. Plaintiff Houghton's termination was therefore based on reasonable factors other than age and was "for good cause," as permitted under 29 U.S.C. § 623(f)(3).

Conclusions of Law
This Court has jurisdiction over the parties and subject matter of this litigation pursuant to 29 U.S.C. § 626(c), and all conditions precedent to the filing of this lawsuit have been met by all parties.
The initial question before the Court is the burden of proof imposed upon the parties. As stated in the findings of fact above, defendant McDonnell has admitted that it removed plaintiff Houghton from flying status on the basis of age, but contends that due to the plaintiff's occupation as a test pilot that age is a bona fide occupational qualification for the purposes of the ADEA, 29 U.S.C. § 623(f)(1).
It is the opinion of the Court that there is no uniform burden of proof imposed upon an employer seeking to assert age as a BFOQ due to a difference of opinion between the only two Courts of Appeals to consider this issue. Hodgson v. Greyhound Lines, Inc. 499 F.2d 859 (7th Cir., 1974); and Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224 (5th Cir., 1976); aff'g sub nom. Hodgson v. Tamiami Trail Tours, Inc., 4 EPD ¶ 7795 (S.D.Fla., 1972).
Both the Greyhound and Tamiami cases involved the practices of the defendants to refuse to hire anyone as an over-the-road bus driver when the applicant was over the age of thirty five (35) and forty (40) respectively.
The District Court in Greyhound found for the plaintiffs and applied the burden of proof of Weeks v. Southern Bell, 408 F.2d 228 (5th Cir., 1969) which required that a company prove a BFOQ only on the basis of the particular individual involved. The Seventh Circuit reversed the District Court in Greyhound and by analogy considered an inter-city bus driver to hold a position akin to that of an airline pilot. Citing Spurlock v. United Air Lines, Inc., 475 F.2d 216 (10th Cir., 1972); and Diaz v. Pan American World Airways, Inc., 442 F.2d 385 (5th Cir., 1971), the Court of Appeals reasoned that since there were more attendant risks to persons other than the party allegedly discriminated against, due to the occupation involved, the employer should bear a lighter burden of proof that age was indeed a BFOQ. 499 F.2d at 863.
The District Court in Tamiami, supra, applied the burden of proof of the Weeks, supra, decision. The Fifth Circuit in affirming the trial court held that for age to be a BFOQ, the defendant must first overcome the threshold burden of proof elucidated in Diaz v. Pan American World Airways, Inc., supra. Upon overcoming that threshold consideration, the BFOQ test stated in Weeks, supra, must then be considered. Tamiami Tours, Inc., at pp. 226-229.
It is the opinion of the Court that the burden of proof elucidated by the Fifth Circuit in Tamiami, supra, is the proper test for determining whether or not the defendant has proved that age is a BFOQ for the purposes of the ADEA.
In response to defendant McDonnell's assertion of age as a BFOQ for the occupation of test pilot, all parties submitted expert testimony and voluminous written exhibits on the study of aging. With reference to the credibility of the various witnesses presented by the parties, the Court thinks that the language of Judge Pollack in Chris-Craft Industries, Inc. v. Piper Aircraft Corporation, 384 F.Supp. 507 (S.D. N.Y., 1974) is particularly appropriate:

*1238 . . . Not surprisingly, each side charges the other's expert witnesses with internal factual inconsistencies. The Court, in a sense, agrees in the main with both parties . . . The selection and preparation of their experts was obviously carefully orchestrated; indeed, it would be naive to assume that the experts were selected and proceeded without regard to the interests of the party who called them. Rather, the record clearly reflects that by and large the experts were result-oriented, a fact which tended to restrict their contribution to something less than a full view . . . 384 F.Supp. at 511-512.
As the Court stated in its findings of fact, its opinion as to whether or not age is a BFOQ is based upon a synthesis of all the evidence presented to it. It is clear that aging is a process which affects in varying degrees all of humanity. The effects of aging result in various physiological changes to the body's tissues and its function. The aging process develops at different rates in different individuals. The evidence adduced at trial indicates that no exact or precise method is available to determine how far advanced the aging process is in any individual, or what the future course of the aging process in that individual will be.
To counter the defendant's assertion that age is a BFOQ for the occupation of test pilot, plaintiff and intervenor-plaintiff have asserted that the proper way to determine whether or not plaintiff Houghton should have been retained on flight status would be by determining his functional or physiological age, rather than relying solely upon his chronological age. As the Court stated in its findings of fact, there is no readily available method which can be used to practically determine the functional age of a person as opposed to his chronological age. There being no practical way to determine plaintiff Houghton's functional age, the Court is of the opinion that defendant McDonnell was clearly acting within its rights to use plaintiff Houghton's chronological age for determining whether or not the plaintiff would be a sufficiently safe test pilot.
It must be noted that intervenor-plaintiff has attempted to assert the chronological/functional age argument with regard to other BFOQ litigation. In Hodgson v. Tamiami Trail Tours, Inc., 4 EPD ¶ 7995 (S.D.Fla., 1972), the District Court stated at p. 6051:
The evidence has shown that functional age, as distinguished from the chronological age, of a driver applicant cannot be determined with sufficient reliability to meet the special safety obligations of motor carriers of passengers . . .[3] Accord, Hodgson v. Greyhound Lines, Inc., 499 F.2d at 864.
The decisions in both Hodgson v. Greyhound Lines, Inc., supra, and Hodgson v. Tamiami Trail Tours, Inc., used the analogy of a bus driver being similar to the pilot of a commercial airliner in that safety decisions must be made rapidly, and that a high degree of care and responsibility were placed upon the bus driver. It does not require a quantum leap in logic to infer that a test pilot operating an aircraft within the far reaches of the flight design envelope[4] is under far more strain than a bus driver proceeding from point to point, or an airline pilot on a normally scheduled and established flight.
It is interesting to the Court that the plaintiff-intervenor has promulgated a regulation found at 29 C.F.R. § 860.102(d) which states for the purpose of the ADEA that age may be a BFOQ "when such conditions are clearly imposed for the safety and convenience of the public. This exception would apply, for example, to airline pilots within the jurisdiction of the Federal Aviation Agency. Federal Aviation Agency regulations do not permit airline pilots to *1239 engage in carrier operations, as pilots, after they reach age sixty (60)." The corresponding Federal Aviation Administration regulation may be found at 14 C.F.R. § 121.383(c). The prohibition against an airline pilot flying after his sixtieth birthday has been uniformly upheld by the courts as promoting safety in air commerce. Air Line Pilots Assn., Internat'l v. Quesada, 286 F.2d 319 (2nd Cir., 1961); and O'Donnell v. Shaffer, 160 U.S.App.D.C. 266, 491 F.2d 59 (1974).
Likewise air traffic controllers, law enforcement officers or fire fighters in the employ of the United States government are subject to mandatory retirement upon their reaching the ages of fifty-six (56) and fifty-five (55), respectively, under the provisions of 5 U.S.C. § 8335(f) and (g). The legislative history of 5 U.S.C. § 8335(f) makes it clear that the drafters of that statute were concerned with the toll of the aging process upon air traffic controllers, and the resulting increased safety risk to the general public. 2 United States Code, Congressional and Administrative News, (92nd Congress, 2nd Session, 1972) pp. 2288, 2289, 2294 and 2295.
It is clear from the evidence presented to the Court at trial that the ultimate consumers of the airplanes with which plaintiff Houghton tested, namely, the United States Air Force and Navy, tend to restrict their pilots from flying such supersonic aircraft after the age of approximately fifty (50).
It is apparent that if the various agencies and armed services branches of the United States, as discussed above, restrict certain occupations dealing with air safety to persons under a certain chronological age, that age can certainly be a BFOQ under the provisions of the ADEA for this lawsuit.
Defendant McDonnell Douglas was intimately associated with the plaintiff and his flying abilities. It is clear to the Court that defendant McDonnell made a good faith decision based upon the plaintiff's age, that the plaintiff would be a safety risk while acting as a Production test pilot. The defendant's action in removing the plaintiff from flight status is, in the opinion of this Court, not the arbitrary discrimination which the ADEA was intended to combat. 2 United States Code, Congressional Administrative News, (90th Congress, 1st Session, 1967) p. 2225.
As the United States Court of Appeals for the Eighth Circuit recently stated in another case involving the piloting of aircraft:
. . . The considerations involved literally go to matters of life and death, both of an individual and his fellows, in the air and on the ground. This is an area into which we will not intrude . . Ampleman v. Schlesinger, et al., 534 F.2d 825 (8th Cir., 1976).
Using the burden of proof imposed by Usery v. Tamiami Trail Tours, Inc., supra, the Court is of the opinion that defendant McDonnell has carried its burden of proof with regards to establishing age as a BFOQ for the occupation of test pilot under the ADEA. The circumstances which led to defendant McDonnell's withdrawing plaintiff Houghton from flying status were peculiarly within the knowledge of the defendant, and the Court sees no reason to intervene in the matter, where such age limits are routinely imposed upon other flight or flight related personnel in both more hazardous (i. e., fighter pilots in the armed services) and in less hazardous (i. e., air traffic controllers).
It having been established that age is a BFOQ for the occupation of test pilot, the Court must now determine whether or not plaintiff Houghton's discharge by the defendant was on the basis of age or was "for good cause as permitted under 29 U.S.C. § 623(f)(3)." The evidence clearly shows that the termination of plaintiff's employment was not due to his age but was due to his negative attitude upon his removal from flying status. Defendant McDonnell Douglas, in the opinion of the Court, made every effort to find the plaintiff a corresponding job, but the plaintiff's continuing refusal to accept any job other than one involving flying forced defendant to terminate the plaintiff for good cause. *1240 It is clear that an employee may be discharged for good cause at any time, absent discrimination. Tims v. Board of Education of McNeil, Arkansas, 452 F.2d 551, 552 (8th Cir., 1971); and Harper v. Trans World Airlines, Inc., 385 F.Supp. 1001, 1004 (E.D. Mo., 1974) aff'd 525 F.2d 409 (8th Cir., 1975).
The Court is aware of the delights of:
. . . Slipp[ing] the surly bonds of Earth
And danc[ing] the skys on laughter silvered wings . . .
Magee, High Flight.

However, it is equally clear that:
The Moving Finger writes; And, having writ,
Moves on: Nor all your Piety nor Wit shall lure it back to cancel half a line,
Khayyam, The Rubiat, E.D. 4 lxx, (Fitzgerald translation).
The refusal of plaintiff Houghton to realize that he would no longer be able to fly as a test pilot for the defendant led to his discharge for good cause.
For the foregoing reasons, the defendant, McDonnell Douglas Corporation, shall have judgment against the plaintiff, Phillip W. Houghton, and the Intervenor-Plaintiff, W. J. Usery, Jr., Secretary of Labor, on all issues.
NOTES
[1] Flight or design envelope is an aeronautical term of art which describes the predicted characteristics and performance of an aircraft when operated in the manner designed.
[2] The term "G" refers to the normal gravitational acceleration placed upon an object located at sea level on the earth's equator. The maneuvers of a Production test pilot which require him to accept accelerations in excess of one "G", have the effect of making the pilot feel as though he weighed more than he actually does. For example, a pilot experiencing the acceleration of 5 "Gs" would feel as though he weighed five times his actual body weight. The effect of acceleration, depending upon the vector of the acceleration to the pilot, results in the pooling of blood in certain parts of the body, and depriving other parts of the body of a blood supply. A common effect of high acceleration is a "gray-out, or a red-out", both of which can significantly affect the visual accuity and mental ability of the person who is undergoing the acceleration. Production test pilots wear "G" suits which increase their tolerance to acceleration by approximately two "Gs" by preventing excess blood flow away from the upper part of their body during maneuvers requiring high acceleration.
[3] In affirming the District Court, the Court of Appeals stated: "Medical science could not accurately separate chronological from functional or physiological age." Tamiami, supra, at p. 41.
[4] See footnote No. 1.