474 F.Supp. 193 (1979)
Philip W. HOUGHTON, Plaintiff,
and
Ray Marshall, Secretary of Labor, United States Department of Labor, Intervenor-Plaintiff,
v.
McDONNELL DOUGLAS CORPORATION, Defendant.
No. 73 C 14(2).
United States District Court, E. D. Missouri, E. D.
June 29, 1979.
John J. Schlueter, Davidson & Schlueter, St. Louis, Mo., Gilbert Drucker, U.S. Dept. of Labor, Chicago, Ill., for plaintiff.
Veryl L. Riddle, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This cause was tried to the Court sitting without a jury, beginning on November 6, 1978, pursuant to the Opinion and Mandate of the United States Court of Appeals for the Eighth Circuit dated April 20, 1977, as amended June 1, 1977, Houghton v. McDonnell Douglas Corp., 553 F.2d 561 (8th Cir. 1977).
*194 This action was brought under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, et seq. (the "ADEA") by plaintiff Philip W. Houghton. Houghton's complaint alleged that defendant McDonnell Douglas Corporation (McDonnell) had violated § 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1), by removing him from flight status and terminating his employment, thus entitling him to injunctive and monetary relief. The Secretary of Labor (the "Secretary") thereafter intervened, alleging in his complaint that McDonnell had violated, and continues to violate, sections 4(a)(1) and 4(a)(2) of the ADEA, 29 U.S.C. § 623(a)(1) and (2). The Secretary's complaint seeks injunctive relief.
The Mandate of the United States Court of Appeals for the Eighth Circuit entered in this case states:
If on remand it is found that Houghton is still physically capable of safely and effectively performing the duties of Chief Production Test Pilot, he must be reinstated to that position . . . [I]n the event the District Court finds on remand that Houghton is unable at that time to physically qualify for the position of Chief Production Test Pilot, it should then determine from the evidence when such disability occurred and fix the damages accordingly . . .
553 F.2d at 565.
On November 3, 1978, the Eighth Circuit denied plaintiff's motion to clarify the above Mandate, deleting any reference to reinstatement.
The plain meaning of the Order remanding this case is that although defendant did not meet the burden of proof applied by that court with respect to the bona fide occupational qualification defense, § 4(f)(1) of the ADEA, 29 U.S.C. § 623(f)(1) on the evidence introduced, plaintiff was not automatically entitled to the protection, and defendant was not automatically subject to the prohibition of the age seventy (70) rule contained in 29 U.S.C. § 631(a). This is interpreted by the court as a salient inference that at some point age may be a bona fide occupational qualification for plaintiff Houghton.
Whether plaintiff is still physically capable of qualifying for Chief Production Test Pilot is a question appurtenant only to plaintiff's abilities as extrapolated from age-related factors.
However, any determination as to plaintiff's ability to safely and effectively function as Chief Production Test Pilot at a given time is inextricably bound up with:
(1) whether psychological and physiological changes due to age can be tested with sufficient reliability to justify the possible safety risks involved in requiring employment of older pilots (apparently up to age 70, 29 U.S.C. § 631(a)) in the cockpits of some of the most esoteric and potentially dangerous machinery ever conceived by man. See Rombough v. Federal Aviation Administration, 594 F.2d 893, 899 (2nd Cir. 1979); Starr v. Federal Aviation Administration, 589 F.2d 307, 314 (7th Cir. 1979); Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224, 238 (5th Cir. 1976); Hodgson v. Greyhound Lines, Inc., 499 F.2d 859 (7th Cir. 1974), cert. denied sub nom.; Brennan v. Greyhound Lines, Inc., 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975);
(2) in the absence of the reliable testing methods outlined above, whether any adequate system of error management can be implemented which equivalently protects the public safety while simultaneously promoting "employment of older persons based on their ability rather than age" and prohibiting "arbitrary discrimination". See 29 U.S.C. § 621(b).
This Court does not interpret the Mandate as specifying McDonnell's medical requirements, including an FAA Class II Medical Certificate, as the standards by which to determine if plaintiff is still physically capable of safely and effectively performing the duties of Chief Production Test Pilot. A motion for just such an interpretation was denied by the Eighth Circuit, and this Court is further influenced by the fact that McDonnell had not theretofore been presented with a similar situation in that *195 plaintiff Houghton, in 1971, was almost four years older than any other test pilot who had ever flown for defendant.
The parties were advised by the Court that evidence from both trials would comprise the record herein, subject to objections by both parties taken with the case. After consideration of the record in light of the Mandate of the United States Court of Appeals for the Eighth Circuit, the Court hereby makes and enters the following findings of fact and conclusions of law. Certain findings contained at 413 F.Supp. 1230, D.C., are reaffirmed below.

Findings of Fact
1. Plaintiff Philip W. Houghton was born on October 1, 1919, and now resides in St. Louis County, Missouri.
2. The intervenor-plaintiff is the Secretary of Labor.
3. Defendant McDonnell Douglas Corporation is a corporation organized and existing under the laws of the State of Maryland, having its principal office and place of business in the State of Missouri. At all relevant times defendant has been an employer subject to the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq., by virtue of 29 U.S.C. § 630(b).
4. Defendant McDonnell is engaged in the manufacture and sale of high performance military aircraft to the government of the United States and other foreign states.
5. The high performance aircraft produced by McDonnell include the F-4 Phantom, which is a military fighter aircraft. This aircraft has been produced by defendant in various models since 1958.
6. The F-4 is still in production by the defendant and has a capability, at certain altitudes, of reaching speeds in excess of twice the speed of sound (Mach 2), and is generally flown by a single pilot with a radar observer/weapons officer in the rear seat.
7. Defendant McDonnell also presently produces the F-15 Eagle which is a military fighter aircraft similar to the F-4. The F-15 is a single-seat high altitude interceptor. The design and technology of the F-15 represents a significant advance over the design technology employed in the production of the F-4.
8. The F-4 has the following characteristics of performance:
(a) It accelerates from zero miles per hour to one hundred seventy (170) miles per hour take-off speed in ten (10) seconds using seventeen hundred (1700) feet of runway, and after gear and flap retraction, it can accelerate at a rate of seven hundred eighty (780) miles per hour per minute.
(b) It climbs from sea level to an altitude of thirty five thousand (35,000) feet in two and one-half minutes from brake release.
(c) In level flight, depending upon the altitude and temperature, the aircraft speed may exceed twice the speed of sound (Mach 2), or over two thousand (2,000) feet per second.
(d) At maximum level flight speed closing on a collision course with another object, a closing speed is one thousand four hundred forty (1,440) miles per hour, or two thousand eighty (2,080) feet per second; for a similar aircraft on a head-on collision course, the closing speed would be two thousand eight hundred eighty (2,880) miles per hour, or four thousand one hundred sixty (4,160) feet per second.
(e) The aircraft's landing speed is approximately one hundred eighty (180) miles per hour.
9. The F-15 has similar but somewhat awesome performance characteristics:
(a) It accelerates from zero miles per hour to one hundred seventy (170) miles per hour take-off speed in eight (8) seconds using an equivalent length of runway as the F-4. After gear and flap retraction, it can accelerate at a rate of thirteen hundred (1300) miles per hour per minute.
(b) It climbs from sea level to an altitude of thirty five thousand feet in two minutes from brake release.

*196 (c) In level flight, depending upon altitude and climate, the aircraft speed may exceed two point five times the speed of sound (Mach 2.5) or over twenty four hundred (2,400) feet per second.
(d) At maximum level flight speed closing on a collision course with another object, the closing speed is sixteen hundred fifty (1,650) miles per hour, or two thousand four hundred twenty (2,420) feet per second. Or, if the other object were a similar aircraft on a head-on collision course the closing speed would be thirty three hundred (3,300) miles per hour or four thousand eight hundred forty (4,840) feet per second.
(e) The landing speed of the F-15 is similar to the landing speed of the F-4.
10. Defendant McDonnell employs three categories of test pilots: Experimental, Engineering and Production. As of January 1, 1972, defendant listed fifteen (15) test pilots on its test pilot roster, including plaintiff Houghton. Of these pilots, nine (9) were Experimental Test Pilots, four (4) were Engineering Test Pilots, one (1) was a Production Test Pilot, and the last, Houghton, was a Chief Production Test Pilot.
11. Of the three categories of test pilots, the duties of an Experimental Test Pilot are the most demanding:
(a) An Experimental Test Pilot must be qualified to perform experimental and production testing and must be able to use engineering abilities while performing a series of prescribed tests and maneuvers on new types or research models of aircraft on their initial flights, including: (1) flights evaluating performance; (2) development flights expanding the limits of the aircraft flight or design envelope[1] or weapon system; (3) high risk flights demonstrating structural integrity, control system modifications, maneuverability, missile/gunfiring, etc.
(b) Experimental test flights of fighter aircraft of the type produced by McDonnell tend to be more strenuous both physically and psychologically than Production test flights because of the nature of the duties involved. Experimental test flights sometimes require a higher degree of precision flying, more frequent radio contact with the ground and occasional note-taking by the pilot during flight. Experimental flights sometimes require a pilot to wear additional clothing or equipment.
12. An Engineering Test Pilot is required to pilot test aircraft through a series of prescribed tests and maneuvers in order to determine compliance with engineering specifications during sub-system development tests such as auto-pilot, flight control, radar and electronic navigation, weapons systems tests, engine tests and other development flights.
13. A Production Test Pilot is expected to use engineering abilities while piloting recently assembled production aircraft through a series of prescribed tests and maneuvers in order to functionally evaluate items such as the air-frame, navigation and radar systems, power plant and other items for final company acceptance before delivery to the customer.
14. A typical production test flight consists of take-off, flight to the testing area, and return to the St. Louis airport within a time of approximately one hour and fifteen minutes.
15. In many instances the plane being flown has never been flown before the production test flight.
16. The test pilot flies the aircraft without a co-pilot or other person capable of flying or landing the aircraft.
17. Portions of the flight commonly occur in the vicinity of a major city with the attendant dangers to the general population in the event of an accident or crash.
18. At the beginning and end of a production test flight, pilots fly over heavily populated areas of the City and County of St. Louis.
*197 19. During a production test flight, the pilot is required to undergo a brief two to three second acceleration of approximately five G's,[2] pull up check to check the structural integrity of the aircraft, plus one brief pull up of approximately four "G's" to observe the disengagement of the auto-pilot system.
20. The production test flight also includes, in addition to the acceleration test, a level speed run approaching twice the speed of sound (Mach 2) to verify the integrity of the air-frame and proper operation of the engines at supersonic speeds.
21. The Production Test Pilot is also expected to conduct a radar intercept test which consists of closing upon a friendly target at a rate in excess of one thousand miles per hour. The Production Test Pilot must also be able to fly over rolling terrain and attempt to maintain a constant altitude of two hundred fifty (250) feet above the Earth at speeds up to five hundred fifty (550) miles per hour or eight hundred (800) feet per second.
22. During the production test flight, the pilot is required to perform a great number of tasks ranging from relatively simple to highly complex. The pilot must maintain visual alertness for objects or other aircraft, which may or may not occur while flying above overcast cloud cover and against a constant color sky background, thereby eliminating a horizon reference with a resulting loss of equilibrium. In addition, the pilot must monitor, but not simultaneously, approximately twenty (20) different systems aboard the aircraft involving forty (40) different instruments relating to the performance and flight of the aircraft.
23. All test pilots may be called on occasion to conduct ferry flights, the delivery of finally accepted aircraft to the customer, which may involve long flight hours with in-flight refueling.
24. A Production Test Pilot must perform his duties under conditions of psychological and physiological stress which may be caused by one or more of the following factors:
(a) factors beyond the pilot's control, such as delay in preparation of the aircraft for flight or bad weather, frequently postponed production test flights for hours or days, resulting in frequent reminders by management that there may likewise be delay in meeting delivery schedules.
(b) in testing the air-frame and engines during the production test flight, the pilot must approach maximum limit design dynamic pressures during high speed flight and the maximum lift coefficient during maneuvering flight at high altitudes.
(c) test flights of such high performance fighter aircraft require an extremely high degree of concentration. Weather conditions may cause concern because of their bearing on the test pilot's ability to complete his mission. In the event of a long ferry flight for delivery to a customer, weather conditions may influence the pilot's ability to affect a timed rendezvous for in-flight refueling and to reach and land at his final destination.
(d) immediately following a production test flight, pilots undergo oral debriefings with technical experts lasting up to thirty (30) minutes, and then must make written discrepancy flight reports.

*198 (e) at certain times cockpit conditions, in terms of heat and noise, may be quite uncomfortable.
25. After World War II services as a pilot, flying P-51 aircraft, plaintiff Houghton, then twenty seven (27) years old, was employed by McDonnell as an assistant aerodynamicist. In 1951, he became a Production Test Pilot, and in the same year was promoted to Experimental Test Pilot.
26. At the age of thirty seven (37), in 1956, plaintiff Houghton ceased his activities as an Experimental Test Pilot and became Chief Production Test Pilot, in which position he remained until March of 1972.
27. The position of Chief Production Test Pilot requires, in addition to the Production Test Pilot duties heretofore described, (1) the responsibility for production and flight operations and the functional supervision of Production Test Pilots, and (2) performance as a pilot on experimental tests, engineering tests, acceptance tests and support flights. During plaintiff's tenure as Chief Production Test Pilot at McDonnell there were never two people who were Chief Production Test Pilots nor were there ever two people who had similar responsibilities even though one of them had the Chief Production Test Pilot title.
28. In 1971, due to the declining production rate, defendant McDonnell found it necessary to reduce its pilot staff in order to provide each pilot with the amount of proficiency flying required by Air Force Regulation 55-22.
29. In July of that year, plaintiff Houghton was first informed by management of defendant McDonnell of the need to reduce the staff of approximately fifteen (15) pilots and to transfer plaintiff Houghton from that staff. Plaintiff Houghton expressed opposition to such a plan.
30. Plaintiff Houghton was told by defendants' Vice President for Laboratory and Flight Development, William S. Ross, that Houghton would be removed from flight status on December 31, 1971.
31. In 1971, plaintiff Houghton was almost four (4) years older than any other test pilot who had ever flown for defendant McDonnell.
32. Plaintiff Houghton's removal from flying status was made on the above date upon defendant McDonnell's good faith determination that his continued employment as a test pilot would be an increased safety risk due to plaintiff Houghton's age. This decision did not have its genesis with the reduction necessitated by Air Force Regulation 55-22. But rather, the process began as early as 1966 or 1967 in discussions between Ross and Houghton. During these discussions Houghton indicated he would never accept non-flying status. At the first trial Houghton testified that at that time he was never considering the point that he was ready to stop flying in any finite terms. During this period of years, defendant McDonnell had been trying to persuade plaintiff Houghton to accept a non-flying job due to McDonnell's concern over increased safety risks due to the plaintiff's age.
33. The precise timing for the removal of plaintiff Houghton from flight status was required by the necessary reduction in staff caused by the declining production rate and the resultant necessity of providing each pilot with the amount of proficiency flying required by Air Force Regulation 55-22.
34. When plaintiff Houghton was advised of his removal from flight status, defendant McDonnell offered him a position as flight safety engineer, supervising the systems engineering section and also tendered another position in the flight simulation department. The plaintiff was also offered the opportunity to pick a suitable job anywhere in the entire company including its Florida and California facilities. In mid-December of 1971, Vice President Ross asked plaintiff Houghton about his job-hunting effort and was advised by the plaintiff that both flight safety and flight simulation jobs were "unacceptable". The plaintiff also stated that he was going to resign from the company. Vice President Ross urged him to reconsider and gave plaintiff Houghton four (4) weeks vacation and also four (4) weeks leave of absence.
*199 35. In early March of 1972, plaintiff Houghton told Vice President Ross that he had not found employment inside or outside defendant McDonnell and again rejected the flight safety position. Ross stated that plaintiff Houghton could remain in the test pilot department indefinitely, at the same base pay, as manager of production flight operations (effectively becoming a non-flying Chief Production Test Pilot). Plaintiff Houghton was unenthusiastic about that suggestion.
36. Although he had not flown since December 31, 1971, plaintiff Houghton's flight pay was not terminated until the end of March of 1972.
37. Shortly after the previously discussed March, 1972 meeting, Vice President Ross again suggested the flight safety job after which plaintiff Houghton reiterated his desire to continue flying. The plaintiff was of the opinion that there was no job which was an "adequate substitute in both job appeal and salary". The only specific job which plaintiff Houghton would "probably accept" was a corporate vice presidency.
38. Plaintiff Houghton became increasingly unhappy and resentful during 1972 as a result of his removal from flight status. His superiors observed that he was becoming a disgruntled employee. The plaintiff conceded that he resented some of the duties assigned to him and refused to perform them. Defendant McDonnell considered his nine (9) months as manager of production flight operations to be non-productive.
39. In response to plaintiff Houghton's attitude, defendant McDonnell determined to assign him to a specific productive job. Plaintiff Houghton was told on December 8, 1972 that he was being transferred to the flight simulation department. On December 12, 1972 plaintiff Houghton refused to accept the transfer. His employment was therefore terminated.
40. Notice of intent to file this action was given to the Secretary of Labor within one hundred eighty (180) days after the alleged unlawful practice occurred and at least sixty (60) days before the filing of this action. Defendant has argued that notice of an intent to file an action with respect to Houghton's discharge should have been given to the Secretary of Labor before this action was filed. This Court, however, is in full agreement with the Eighth Circuit's interpretation that Houghton's transfer from flight status began a sequence of events which resulted in his severance.
41. Plaintiff Houghton and intervenor-plaintiff Secretary of Labor brought this suit alleging that defendant McDonnell, which had employed Houghton as a test pilot, removed him from flight status, reduced his salary and terminated his employment in violation of the ADEA. Both plaintiffs also charged that defendant discriminated against Houghton "with respect to his compensation, terms, conditions and privileges of employment", because of his age in violation of 29 U.S.C. § 623(a)(1). The Secretary also alleged that defendant McDonnell limited, segregated or classified Houghton in a way which deprived, or tended to deprive, him of employment opportunities and otherwise adversely affected his status as an employee, because of his age, in violation of 29 U.S.C. § 623(a)(2).
42. Defendant McDonnell admitted removing plaintiff Houghton from flight status because of his age but contended that this action was taken because age is a bona fide occupational qualification (herein BFOQ) reasonably necessary to the normal operation of defendant's business as permitted under 29 U.S.C. § 623(f)(1). Defendant also admitted terminating Houghton's employment, but contended that this action was not taken because of his age but was based upon reasonable factors other than age and was "for good cause", as permitted under 29 U.S.C. § 623(f)(3).
43. Aging is a loss of function, a loss of ability at a particular time to meet the particular demands of a person's environment. Such changes begin in man in the early twenties, and inevitably result in a progressive deterioration in all physiological functions in all human beings until death. Progressive changes in the human system result as part of the aging process, lessening *200 of the functions of the blood vessels, cells and organs. These changes occur in the thirties and increase in the forties to the point that anyone over the age of fifty is showing signs of aging, and in general those over the age of sixty can be said to have aged. All organs and systems of the body are subject to this inevitable aging process which ultimately results in death. No one is immune from this aging process although different people certainly are affected at differing rates by the aging process. Pilots, like all other people, are subject to this process, and plaintiff Houghton has experienced it.
44. With the onset of the aging process certain physiological changes may or may not take place at different times. It may be said that all the following changes will occur in the general population as they age:
(a) Reaction time slows and the ability to respond diminishes with regard to complex or new tasks performed under time pressure or other stress (overload phenomena).
(b) There may be a loss of vision.
(c) There is a possibility of a reduction of hearing acuity.
(d) There are changes in blood vessels which impair function or adaptation to stress.
(e) There is decrease in respiratory function and efficiency.
(f) Resistance to fatigue decreases with age, strength will tend to diminish with age, and the basal metabollic rate decreases with age.
45. Such age related deteriorations are not always detected or even detectable. Degenerative changes of the circulatory and nervous systems cause subtle changes in reaction time, memory, psychomotor functions, information processing capability, other cognitive functions and personality, which may or may not be detectable, but any one of which could gradually predominate and cause mistakes in judgment with regard to vehicle control responsibilities. Some pilots will suffer these changes before the age of sixty. Generally, abilities to perform highly-skilled tasks rapidly, to adapt to new and changing environmental situations, to resist fatigue, to maintain physical stamina, and to perform effectively in a complex and stressful environment begin to decline in early-middle life and continue to decline at fairly steady rate thereafter.
46. Since these deteriorations are not always even detectable, there was no way to determine the extent to which pilot experience compensates for them or the point at which such compensatory mechanisms fail.
47. As age increases so does the risk of sudden incapacitation. The progressive deterioration with age of physiological and psychological functions results in the possibility of significant medical defects. The incidence of sudden incapacitation due to these medical defects increases with age but cannot be predicted with any accuracy in individuals. Plaintiff's experts focused primarily on Houghton's functional cardiovascular aerobic capacity. With respect to Dr. Bruce's testimony, the Court would note the following. Dr. Bruce has little or no experience in evaluating pilots for safety, nor did he purport to make an examination of Houghton's skilled task performance, nor did he meaningfully address the question of Houghton's physical ability to do his job safely in light of his age because he did not think that was part of the charge. Further, this Court was shocked by plaintiff's deposition testimony that counsel for the Secretary suggested to plaintiff through his attorney to eat three candy bars a day for three days leading up to the examination in an attempt to improve the results of the examination. Dr. Proper's testimony was also substantially confined to Houghton's cardiovascular status. All of his testimony must be viewed in light of his statement that it is still most precarious to equate laboratory information with performance in the cockpit, and his statement that he was not qualified to determine whether someone can fly or not. In support of plaintiff's case, Dr. Mohler did testify that psychomotor skills could be measured. However, the testimony in this case firmly established that Dr. Mohler's views do not enjoy widespread acceptance.
*201 48. Plaintiff Houghton testified at the time of the first trial that he was at least as fit as he had ever been, but was forced to concede that aging had taken its toll upon him. He stated that he probably could not withstand six or seven "G's" for as long a period of time as he did when he was in the Air Force and flying a P-51 fighter aircraft. Plaintiff Houghton also stated that he had a tendency to become somewhat more fatigued in his flying during his fifties than he had during his thirties. At the time of the second trial, he had undergone additional correction for his vision.
49. There is no generally recognized way of determining a man's psychophysiologic age. Even those proponents of such a measurement, however, concede that plaintiff's psychophysiologic equivalent age is now between forty-nine and fifty-five and that he aged psychophysiologically about five or six years since termination of his employment as a test pilot. The method of calculation used by Dr. Bruce suggests that he has only eighty per cent (80%) of the aerobic capacity of a healthy man of age forty.
50. The Federal Aviation Administration (FAA), which is responsible for air safety in this country, has adopted a rule prohibiting commercial airline pilots from flying once they have reached age sixty (60). This rule was adopted for medical reasons primarily the inability of medical examinations to determine future health and the diminution of pilot performance from aging. In this regard it is important to compare the dissimilar performance characteristics of the aircraft involved. For instance, a commercial airline pilot is not flying alone and rarely exceeds speeds of .6 to .8 Mach. See Finding 53, infra.
51. The FAA has recently denied petitions for exemption from the age sixty rule filed by individual pilots who submitted medical data similar to that presented to plaintiff Houghton in this case. The FAA decisions are based upon the fact that neither these tests nor any others can adequately measure the adverse effects on pilot performance due to aging or obviate the risks from sudden incapacitation and hence they cannot assure adequate safety.
52. The occupation of a Production Test Pilot is more demanding and hazardous than that of commercial airline pilots and hence requires additional weight to be given to the effects of aging. This greater hazard is attributable to:
(a) the task performed by the test pilot;
(b) the performance characteristics of the previously untested aircraft in which he performs these tasks;
(c) the conditions under which he performs these tasks; and
(d) the fact that such a pilot flies without a co-pilot or other person capable of landing the plane.
53. The most significant credible and probative medical evidence contained within this corpulent record was that adduced through Dr. Earl T. Carter, Professor of Preventive Medicine, Mayo Clinic, Rochester, Minnesota. Dr. Carter's qualifications place him at the summit of medical authorities in the field of aviation medicine. His qualifications also indicate that he treats and examines people as well as writing papers and other memoranda concerning the general problem. In the opinion of this Court, Dr. Carter's analysis is entitled to great weight in view of his unique background combining academic aerospace medicine, practical experience with thousands of examinations of professional pilots, responsibility for determining whether pilots are medically qualified to fly, and consultation with the United States Government on the age sixty rule. Dr. Carter examined the plaintiff in August of 1978. Basing his opinion on that examination, the duties of Chief Production Test Pilot, plaintiff's increased susceptibility to sudden incapacitation due to his age, and the inability of clinical medicine adequately to evaluate the age-related decline in psychomotor skills, Dr. Carter determined that plaintiff was not physically capable of safely and effectively performing the duties of a Production Test Pilot at McDonnell at age fifty three (53). Dr. Carter described the age *202 range in the lower fifties as a "gray area" where it becomes increasingly easy to demonstrate the advantages of youth below fifty and increasingly easy to demonstrate the impact of aging about fifty. When asked what would be his opinion at age fifty two (52), Dr. Carter, in recognizing the aforesaid uncertainty, stated that he would "err on the side of safety" while reiterating his position that since scientific technology is not precise enough to determine a person's psychophysiologic age, there is no alternative to establishing an arbitrary age limit, if flight safety is to be considered.
54. Neither medical science nor aviation experience can identity with certainty the precise time in which plaintiff Houghton became physically incapable of safely and effectively performing the duties of a Production Test Pilot. The weight of persuasive evidence clearly indicates that disabling physical conditions other than certain cardiovascular events cannot be predicted by attempted measurements of psychophysiologic age with sufficient reliability to justify the safety risks occasioned by requiring employment of older pilots to the full extent of the age seventy (70) rule contained in 29 U.S.C. § 631(a). In this regard, the Court notes that by an order dated June 1, 1977, the United States Court of Appeals for the Eighth Circuit ordered, inter alia, the phrase ". . . medical technology can predict a disabling physical condition in a test pilot with virtually foolproof accuracy" stricken from the Houghton opinion. Houghton v. McDonnell Douglas Corp., 553 F.2d 561 (8th Cir., 1977) (order revising the opinion).
These risks are in no way mollified by plaintiff's theory that pilots are "slow agers". In the first place, the weight of credible evidence discloses that whatever advantage pilots may enjoy over the general population is greatly reduced over age fifty (50). The "1000 Aviator Study" cannot be said to dispute this evidence since the individuals studied therein were not necessarily working in the field of professional aviation or similar field during their fifties, "aging" was only measured by death, and the study shows essentially identical death rates from cerebrovascular causes.
Furthermore, the weight of evidence that critical functions deteriorate in older pilots is not compensated for by pilot experience. While it may be stated in the abstract that the experience which comes with aging can often compensate for reduction in certain maximal capacities, medical science cannot adequately determine the extent to which experience cannot counteract the functions which undeniably deteriorate. Furthermore, even plaintiff's evidence indicated that pilots over age fifty nine (59) at all levels of recent flying experience had sharply higher accident rates.
55. As stated, supra, in the absence of reliable testing methods to determine psychophysiologic age or functional age, some system of error management must be implemented which equivalently protects the public safety, while simultaneously promoting the avowed purposes of the ADEA. On the basis of the evidence presented and the Mandate herein, this Court could not find that plaintiff Houghton was physically capable of safely and effectively performing his duties as Chief Production Test Pilot when he was grounded. The Court, therefore, finds that plaintiff Houghton was unable to safely and effectively perform the duties of Chief Production Test Pilot when he was grounded by McDonnell at age fifty two (52). Although Houghton was not involved in commercial public air transportation, the risk of public safety attendant to the performance of his duties as Chief Production Test Pilot is in no way diminished, but to the contrary, is greatly enhanced considering the different characteristics of the airplanes involved, the nature of his duties, and the areas over which the tests are conducted. This Court does not discount the effects that unwanted retirement can have upon an individual, nor does it believe that the conditions which "disabled" plaintiff herein would be applicable to other situations absent the enormous safety risks, unique qualifications, and scientific uncertainty involved in this case.

*203 Conclusions of Law

In accordance with the Mandate of the United States Court of Appeals for the Eighth Circuit, this Court finds that plaintiff Houghton became physically unable to safely and effectively perform the duties of Chief Production Test Pilot at some time prior to his removal from flight status. Plaintiff Houghton's damages must therefore be fixed as non-existent since his removal from flight status and subsequent dismissal were not in violation of the ADEA.
NOTES
[1] Flight or design envelope is an aeronautical term of art which describes the predicted characteristics and performance of an aircraft when operated in the manner designed.
[2] The term "G" refers to the normal gravitational acceleration placed upon an object located at sea level on the Earth's equator. The maneuvers of a Production Test Pilot which require him to accept accelerations in excess of one "G" have the effect of making the pilot feel as though he weighs more than he actually does. For example, a pilot experiencing the acceleration of five "G's" would feel as though he weighed five times his actual body weight. The effect of acceleration depending upon the vector of the acceleration to the pilot results in the pooling of blood in certain parts of the body and depriving other parts of the body of a blood supply. A common effect of high acceleration is a "gray-out" or a "red-out" both of which can significantly effect the visual acuity and mental ability of the person who is undergoing acceleration. Production Test Pilots wear "G" suits which increase their tolerance to acceleration by approximately two "G's" by preventing excess blood flow away from the upper part of their body during maneuvers requiring high acceleration.