Phillip W. HOUGHTON, Appellant,

and

Equal Employment Opportunity Commission, Intervenor,

v.

McDONNELL DOUGLAS CORPORATION,
Appellee.

Phillip W. HOUGHTON, and Equal Employment Opportunity Commission, Appellants,

v.

McDONNELL DOUGLAS CORPORATION,
Appellee.

Nos. 79–1693, 79–1715.

United States Court of Appeals,
Eighth Circuit.

Submitted March 12, 1980.

Decided Aug. 13, 1980.

Rehearing Denied Oct. 28, 1980.

Mark S. Flynn, Atty., E.E.O.C. (argued), and Leroy D. Clark, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Beatrice Rosenberg, Asst. Gen. Counsel, Washington, D. C., on brief, for E.E.O.C.

Anna R. Lavin (argued), and John J. Schlueter, Alan S. Mandel, Edward J. Calihan, Jr., Chicago, Ill., Davidson & Schlueter, St. Louis, Mo., on brief, for Houghton.

Thomas C. Walsh (argued), Bryan Cave, McPheeters & McRoberts, Veryl L. Riddle and Michael G. Biggers, St. Louis, Mo., on brief, for McDonnell Douglas.

John S. Yodice and Charles J. Peters, Washington, D. C., on brief, for amicus curiae Aircraft Owners and Pilots Ass'n.

Before BRIGHT and ROSS, Circuit Judges, and HANSON, Senior District Judge.*

BRIGHT, Circuit Judge.

We now consider the third appeal in this age discrimination suit in which Phillip Houghton, a former production test pilot for McDonnell Douglas Corporation (McDonnell Douglas or the Company), seeks relief under the ADEA [1] from his removal from flight status and subsequent discharge. The district court denied any relief to Houghton or to the intervenor, Equal Employment Opportunity Commission (EEOC).[2] These appeals followed. We reverse and remand for entry of an appropriate judgment granting Houghton backpay and attorneys' fees.

We first review the proceedings prior to the litigation that gave rise to the present appeals. Initially, we considered an appeal from an interlocutory order denying intervention by the Secretary of Labor. We reversed and authorized the intervention. *Brennan v. McDonnell Douglas Corp.*, 519 F.2d 718 (8th Cir. 1975). Thereafter, the district court denied Houghton and the Secretary relief on the merits, holding that Houghton at age fifty-two could no longer qualify for flight status because age constitutes a bona fide occupational qualification (BFOQ) under the ADEA, 29 U.S.C. § 623(f)(1) (1976).[3] We reversed this judgment and remanded the case to the district court to fashion appropriate relief. *Houghton v. McDonnell Douglas Corp.*, 553 F.2d 561 (8th Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 451 (1977) (*Houghton I*).

The district court thereafter heard additional evidence and found Houghton unqualified to fly at the time of his removal from flight status and denied any relief to him or to the intervenor. *Houghton v. McDonnell Douglas Corp.*, 474 F.Supp. 193 (E.D. Mo. 1979). Houghton and the EEOC bring these appeals.

I. *Background.*

Our review of the district court's denial of any relief to the appellants requires that

---

* WILLIAM C. HANSON, United States Senior District Judge, Southern District of Iowa, sitting by designation.

1. Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. §§ 621–634 (West Supp. 1980).

2. The Secretary of Labor's enforcement responsibilities under the Age Discrimination in Employment Act were transferred to the EEOC on July 1, 1979 (Reorganization Plan No. 1 of 1978, 43 Fed. Reg. 19807 (1978); Executive Order No. 12144, 44 Fed. Reg. 37193 (1979)). The EEOC was substituted as plaintiff intervenor on August 21, 1979.

3. The district court opinion, *Houghton v. McDonnell Douglas Corp.*, is reported at 413 F.Supp. 1230 (E.D. Mo. 1976).

we initially focus on our opinion in *Houghton I*. Appellants contend, among other things, that the district court failed to follow our mandate in *Houghton I*. We agree with appellants' assertion.

*Houghton I* recited the facts underlying McDonnell Douglas' decision initially to remove Phillip Houghton from flight status, and subsequently to discharge him. In brief, the court's opinion related that Houghton, born October 1, 1919, had worked for McDonnell Douglas since 1946, serving as Chief Production Test Pilot from 1956 until December 1972. The Company, which followed no set age policy for the transfer of test pilots to nonflying positions, relied solely on "intuitive judgment" and removed him from flight status on December 31, 1971.[4] Ultimately the Company terminated him in December of 1972, allegedly for nonproductivity in his capacity as a nonflying employee.

Houghton brought this action in January of 1973. At trial, the Company admitted that it had removed Houghton from flight status solely because of his age. The Company asserted, however, that, by reason of age, Houghton could no longer qualify to fly as a production test pilot and that the age barrier to flight status constituted a BFOQ for production test pilots under section 4(f)(1) of the ADEA, 29 U.S.C. § 623(f)(1) (1976).[5] Testimony by examining physicians disclosed Houghton to be in good health and medically qualified to fly high performance aircraft. The Company, however, produced opinion evidence from two medical experts "who believed that age is an appropriate BFOQ for production test pilots, based on * * * studies reflecting

physiological and psychological changes that accompany the aging process in the general population." *Houghton I, supra,* 553 F.2d at 563.

In examining the evidence presented in the first trial, this court observed that

the Company's evidence was of a general nature applicable only to the general population * * * [and] it shed little light on the relative capabilities of test pilots as a group to adequately perform their tasks beyond a certain age. [*Id.* at 564.]

The court added these comments on the evidence:

Houghton's evidence, however, was of a specialized nature, showing age changes are much slower among test pilots as a group than among the general population. Indeed, there was no evidence that a test pilot's ability to perform his duties, both safely and effectively, was impaired in such manner as to justify the imposition of the arbitrary age limit applied by the Company here. * * * [6] The record reflects that the safety record of the older professional pilots, within the sample studied, is better than that of the younger ones due to their experience. To cap the climax, even the Company doctors found Houghton in excellent physical condition, and we note a total absence of evidence which would indicate he was not capable of performing test pilot functions. [*Id.* at 564.]

The opinion in *Houghton I* concluded that "the findings of the district court to the effect that age constitutes a BFOQ for Houghton are clearly erroneous." *Id.* at 564.

---

4. The Company, however, did not terminate his flight pay until March 1972.

5. 29 U.S.C. § 623(f)(1) reads:
   (f) It shall not be unlawful for an employer, employment agency, or labor organization—
   (1) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age[.]

6. The reported version of the above discussion at 553 F.2d 564 includes the following:
   On the contrary, it was shown that medical technology can predict a disabling physical condition in a test pilot with virtually foolproof accuracy. [*Id.* at 564.]
   This court's order of June 1, 1977, deleted that language from the court's opinion filed April 20, 1977. *Houghton v. McDonnell Douglas Corp.*, No. 76–1652 (8th Cir., June 1, 1977) (order amending opinion submitted April 20, 1977).

We further held that, although Houghton had been discharged at a date later than his transfer from flight status, "[h]is illegal transfer from flight status, in the face of his insistence upon his statutory rights was the root cause of his severance. He is thus entitled to relief." *Id.* at 564. In our mandate we said:

> If on remand it is found that Houghton is still physically capable of safely and effectively performing the duties of Chief Production Test Pilot, he must be reinstated in that position, awarded such damages as he has suffered by reason of his discharge, and other relief, including attorney fees, to which he is entitled. In calculating damages, the District Court should appropriately consider the substantially lesser salary Houghton would have earned in the position offered him by the Company and such other factors as it deems relevant.
>
> In the event the District Court finds on remand that Houghton is unable at that time to physically qualify for the position of Chief Production Test Pilot, it should then determine from the evidence when such disability occurred and fix the damages accordingly, including those suffered since such disability, awarding any other relief and damages as deemed appropriate. [*Id.* at 565.]

Subsequently, in response to a motion by Houghton to clarify the mandate of this court, we denied clarification and reiterated:

> The opinion states that the sole question on remand is whether Houghton is still physically capable of safely and effectively performing the duties of Chief Production Test Pilot. If he is, he must be awarded such damages as he has suffered by reason of his discharge and other relief, including attorneys fees to which he is entitled.
>
> If Houghton is unable at this time to physically qualify for the position of Chief Production Test Pilot, it should then be determined from the evidence when such disability occurred and fix the damages accordingly. [*Houghton v. McDonnell Douglas Corp.*, No. 76–1652 (8th Cir., Nov. 3, 1978) (order denying motion to clarify).][7]

With that background, we examine the subsequent proceedings in the district court.

## II. *Proceedings on Remand.*

### A. *Physical Examination.*

In August of 1978, the Company referred Houghton to Earl T. Carter, an eminently qualified physician in aerospace medicine serving on the staff of the Mayo Clinic, to undergo a comprehensive medical examination.[8] Dr. Carter performed a general physical examination and reviewed laboratory and x-ray tests. Dr. Harold Mankin of the Division of Cardiovascular Diseases at

---

7. While we note that this language does not mention reinstatement, we attach no significance to that omission.

8. The following tests are used by the Mayo Clinic for pilots:
   I. Comprehensive medical history.
   II. Complete physical examination by physician.
   III. Ancillary examination procedures:
      A. Audiographic measurement of hearing.
      B. Eye examination.
      C. Minnesota Multiphasic Personality Inventory.
   IV. Personal interview with psychologist.
   V. Stress electrocardiogram (exercise ECG).
   VI. Special total body fat content procedure.
   VII. Clinical laboratory tests as follows:
      A. Chest x-ray.
      B. X-ray of lumbar spine.
      C. Resting electrocardiogram.
      D. Thyroid function test.
      E. Glucose tolerance test for diabetes.
      F. Blood minerals, blood sugar, blood proteins.
      G. Liver function tests:
      1. Alkaline phosphatase.
      2. SGOT.
      3. GGT.
      4. Quantitative bilirubin.
      H. Cholesterol.
      I. Cholesterol.
      J. Triglycerides.
      K. Serologic test for syphilis.
      L. Complete peripheral blood counts (red blood count, white blood count, hemoglobin).
      M. Chemical and microscopic examination of urine.

the Mayo Clinic performed an exercise electrocardiogram study while the patient was subject to a strenuous exercise level. Dr. Ivnik of the Clinical Psychology Division performed psychometric studies. Dr. Gordon Moore of the Department of Psychiatry carried out a detailed interview with the patient and reviewed the psychometric studies. None of these tests produced evidence of any underlying organic or psychiatric disorder. Dr. Moore reported that in cognitive skills Mr. Houghton functioned in the 90–95th percentile. No evidence existed of any past or present psychopathology.

Dr. Robert A. Bruce, a world-renowned cardiologist at the University of Washington, Seattle, undertook to subject Houghton to a comprehensive cardiovascular examination at Houghton's request. Dr. Bruce referred Houghton to Dr. Thomas H. Holmes, Professor of Psychiatry and Behavioral Sciences at the University of Washington, for psychological testing. All tests showed normal results and disclosed Houghton to be a very healthy individual with little possibility of sustaining any type of cardiovascular failure within a year's time from the examination.

### B. *Opinion Evidence.*

Four physicians testified at the hearing on remand. Dr. Proper, who had testified at the prior trial and had examined Houghton in 1975, concluded from his review of all the examinations that Houghton's physical condition either had shown no change or actually had improved since 1975. This opinion was shared by Drs. Bruce and Mohler, who also testified for the appellants.

Dr. Bruce testified at length about the "Bruce Protocol," a multistage treadmill test which the doctor had designed. The test measures the functional aerobic capacity of the cardiovascular system, and additionally identifies impairment of the cardiac function. Based on this and other tests, Dr. Bruce concluded that the likelihood of coronary heart disease in Houghton was "quite remote." Dr. Bruce further rendered an opinion that Houghton's "physiological" age was 54.7 years as compared to his chrono-

logical age of 58.8 years on August 3, 1978, the time of testing.

Dr. Mohler, an expert witness for the appellants at the first trial, testified that Houghton's medical examinations disclosed a completely normal functioning of psychomotor skills. The doctor maintained that these skills can be accurately tested by flight simulators. He also asserted that other flight requirements—namely, cognitive skills, ability to concentrate, and ability to withstand G forces—can be measured.

Testifying to a contrary opinion regarding production test pilot qualifications, Dr. Carter of the Mayo Clinic focused on known effects of aging, particularly after fifty, which are not subject to measurement by medical test procedures. We quote some important aspects of that testimony:

> My opinion at this time is that Mr. Houghton is not medically qualified for the duties of a Production Test Pilot or an Engineering Test Pilot and I base this opinion upon a number of factors which I probably should explain, Your Honor, so you'll understand the basis of my opinion, which is not just an out-of-the hat figure.
>
> We * * * did exercise testing on his heart and he maintains normal heart function with exercise, and if the heart were the only issue in this case at this point I unequivocally would say let him fly anything he wants to, but as I say, there are three major factors; the calendar and the physiology, anatomy, and the third, the psychomotor as we call it, the psychological aspects. This is the difficult area.

Dr. Carter testified in detail about the impairment in psychomotor ability that comes with age. He distinguished the cognitive from the abstract function of the brain. The former refers to recall of known information. The abstract function involves not only recall but requires taking recalled data and constructing a solution that previously had not been in existence. Dr. Carter cited a number of studies, three of which we will refer to later in this opinion, that have found a positive relationship between impairment in the abstract func-

tion and age. Finally, Dr. Carter explained that Dr. Bruce's estimate of physiological age, at best, indicates cardiovascular age and that the instrumentation needed to measure abstract problem solving ability and functional age does not exist.

Dr. Carter expressed the opinion that Houghton could not safely and effectively perform the duties of Chief Production Test Pilot at each of the years from age fifty-eight down to age fifty-three, admitting that the certainty of his opinion declined as the years decreased. When asked about age fifty-two, he stated he "would probably err on the side of flight safety." Lastly, Dr. Carter expressed his views based on his experience as follows:

> Well, for many years I have lived with 50 as the cut-off for an engineering test pilot or production test pilot dating way back to my Air Force days * * *.

On cross-examination, Dr. Carter conceded that tests performed on Houghton disclosed no physical impairment and that regardless of the examination he would find a person of Houghton's age unqualified to serve as production test pilot. He repeated that the object of his concern, abstract problem solving, cannot be measured in individuals.

## C. The District Court Opinion.

The district court made numerous findings regarding the functions and duties of a production test pilot,[9] including the following: a production test pilot has no copilot, the plane under certain stress circumstances, and portions of the flight commonly the plane under certain stress circumstances, and portions of the flight commonly occur in the vicinity of a major city. *Houghton v. McDonnell Douglas Corp.*, supra, 474 F.Supp. at 196. In its findings on Houghton's qualifications to fill the position of production test pilot, the district court relied heavily on the testimony of Dr. Carter:

The most significant credible and probative medical evidence contained within this corpulent record was that adduced through Dr. Earl T. Carter, Professor of Preventive Medicine, Mayo Clinic, Rochester, Minnesota. Dr. Carter's qualifications place him at the summit of medical authorities in the field of aviation medicine. His qualifications also indicate that he treats and examines people as well as writing papers and other memoranda concerning the general problem. In the opinion of this Court, Dr. Carter's analysis is entitled to great weight in view of his unique background combining academic aerospace medicine, practical experience with thousands of examinations of professional pilots, responsibility for determining whether pilots are medically qualified to fly, and consultation with the United States Government on the age sixty rule. [*Id.* at 201.]

Based on that testimony, the district court found:

> [I]n the absence of reliable testing methods to determine psychophysiologic age or functional age, some system of error management must be implemented which equivalently protects the public safety, while simultaneously promoting the avowed purposes of the ADEA. On the basis of the evidence presented and the Mandate herein, this Court could not find that plaintiff Houghton was physically capable of safely and effectively performing his duties as Chief Production Test Pilot when he was grounded. The Court, therefore, finds that plaintiff Houghton was unable to safely and effectively perform the duties of Chief Production Test Pilot when he was grounded by McDonnell at age fifty two (52). [*Id.* at 202.]

The district court denied Houghton any damages, reasoning them to be "non-existent [because] his removal from flight sta-

---

9.   13. A Production Test Pilot is expected to use engineering abilities while piloting recently assembled production aircraft through a series of prescribed tests and maneuvers in order to functionally evaluate items such as the air-frame, navigation and radar systems, power plant and other items for final company acceptance before delivery to the customer. [*Houghton v. McDonnell Douglas Corp.*, supra, 474 F.Supp. at 196.]

tus and subsequent dismissal were not in violation of the ADEA." [*Id.* at 203.]

III. *Whether the District Court Violated the Mandate.*

Appellants claim that the district court "has, under the guise of determining Houghton's physical capability, relitigated and redetermined the BFOQ issue." Appellants additionally contend that the court, by admitting evidence of age-related decline in psychomotor skills, has allowed the Company to supplement its deficient proof of a BFOQ. The Company, however, maintains that the trial court complied with this court's mandate by determining the time when Houghton became physically incapable of safely and effectively performing the duties of Chief Production Test Pilot. The Company alternatively requests that we reconsider our opinion in *Houghton I* "in order to avoid clear error, manifest injustice and a divergence among the circuits."

We begin our analysis of these related issues by reiterating this circuit's longstanding view of the law of the case doctrine:

> This court has repeatedly held that the decision on former appeal is the "law of the case" on a question presented in that former appeal, unless the evidence introduced at the subsequent trial is substantially different from that considered on the first appeal, and must be followed in all subsequent proceedings in such case in both district and appellate courts, unless that decision is clearly erroneous and works manifest injustice. * * * While this rule of practice is not a limit of power, it is nevertheless a salutary one, and should be departed from only after careful consideration on situations arising in specific cases.

*Pyramid Life Ins. Co. v. Curry,* 291 F.2d 411, 414 (8th Cir. 1961), *quoting Chicago, St. P., M. & O. Ry. v. Kulp,* 102 F.2d 352, 354 (8th Cir. 1939). [*Otten v. Stonewall Insurance Co.,* 538 F.2d 210, 212 (8th Cir. 1976).]

At the outset, the parties disagree as to what *Houghton I* established as the law of the case. McDonnell Douglas asserts that Houghton's qualifications to fly, aside from a BFOQ, remained open because our mandate directed the district court to determine whether Houghton was "still physically capable of safely and effectively performing the duties of Chief Production Test Pilot[.]" *Houghton I, supra,* 553 F.2d at 565. Focusing on our reversal of the district court's finding that age constituted a BFOQ, McDonnell Douglas further asserts that the appellate panel did not determine that "Houghton was physically qualified in 1977, 1975 or at any other time."

Appellants, however, claim that McDonnell Douglas has attempted to relitigate issues already decided. They assert that the evidence of Dr. Carter, in effect, constitutes evidence of a BFOQ under the guise of evidence relating to Houghton's alleged physical capabilities to safely and effectively perform as Chief Production Test Pilot. Thus, appellants contend that the law of the case barred the district court from considering or even admitting that evidence. *See Nucor v. Tennessee Forging Steel Service, Inc.,* 513 F.2d 151 (8th Cir. 1975); *Paull v. Archer-Daniels-Midland Co.,* 313 F.2d 612 (8th Cir. 1963).

We disagree in part with the contentions of both sides. We interpret the mandate of *Houghton I* as follows.

First, the prior opinion foreclosed McDonnell Douglas from attempting to establish that Houghton was disqualified at age fifty-two. That question has been litigated:

> When a case has been decided by this court on appeal and remanded to the District Court, every question which was before this court and disposed of by its decree is finally settled and determined. The District Court is bound by the decree and must carry it into execution according to the mandate. It cannot alter it, examine it except for purposes of execution, or give any further or other relief or review it for apparent error with respect to any question decided on appeal * *. [*Thornton v. Carter,* 109 F.2d 316, 319–20 (8th Cir. 1940); *see also Nucor Corp. v.*

*Tennessee Forging, supra,* 513 F.2d at 152–53; *Paull v. Archer-Daniels-Midland Co., supra,* 313 F.2d at 616–18.]

Second; Houghton established his right to backpay up to February 18, 1975, for Houghton had introduced evidence of his excellent physical condition to that date. In *Houghton I, supra,* 553 F.2d at 563, we said with respect to the evidence:

> In February, 1975, Houghton was examined by Dr. Proper who found him to be in exceptional physical condition even when compared to pilots and test pilots. He declared Houghton to be 99.9% certain of not suffering a heart attack or stroke while in flight.

McDonnell Douglas did not rebut that testimony; hence, the issue of Houghton's physical qualifications came within the compass of this court's opinion in *Houghton I.*

Under the principles applicable to the law of the case doctrine, the district court is bound by all matters within the compass of our prior opinion. As this court stated in *Thornton v. Carter, supra,* 109 F.2d at 320,

> [a] mandate is completely controlling as to all matters within its compass, but on remand the trial court is free to pass upon any issue which was not expressly or impliedly disposed of on appeal. Since, however, a final judgment upon the merits concludes the parties as to all issues which were or could have been decided (*Guettel v. United States,* 8 Cir., 95 F.2d 229, 230, 118 A.L.R. 1060 and cases cited), it is obvious that such a judgment of this court on appeal puts all such issues out of the reach of the trial court on the remand of the case. That court is without power to do anything which is contrary to either the letter or spirit of the mandate construed in the light of the opinion of this court deciding the case. [Footnote and citation omitted.]

*See also Quern v. Jordan,* 440 U.S. 332, 347 n.18, 99 S.Ct. 1139, 1148 n.18, 59 L.Ed.2d 358 (1979); *Paull v. Archer-Daniels-Midland Co., supra,* 313 F.2d at 316–19.

The language and indeed the letter and spirit of our opinion in *Houghton I* precluded the district court from finding Houghton disqualified for physical reasons up to the commencement of the first trial, in February 1975. The district court simply could not make a contrary determination after we had ruled him entitled to relief.[10] *Cf. In re United States Steel Corp.,* 479 F.2d 489, 499 (6th Cir.), *cert. denied,* 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973) (failure to alter disapproved awards is inexplicable). Accordingly, we hold that the district court erred in denying Houghton backpay relief from the date of his effective removal from flight pay status, March 1972, to February 18, 1975.

## IV. *Reinstatement.*

To the extent that age might disqualify Houghton from being reactivated as a production test pilot, the issue of reinstatement coincides with that of BFOQ applicable to Houghton after February 18,

---

10. The district court's rulings indicate some inconsistency in construing our mandate. In its memorandum order of June 1, 1978, the district court, in referring to the mandate said:

> This language is quite clear. The Court of Appeals found that plaintiff was physically qualified to fly when he was discharged. It has instructed this Court to determine if he is still qualified and, if so, to reinstate him. [*Houghton v. McDonnell Douglas Corp.,* No. 73 C 14 (2) (E.D.Mo., June 1, 1978) (order denying partial summary judgment).]

In its opinion of June 29, 1979, the district court viewed the mandate somewhat differently. The court said:

> The plain meaning of the Order remanding this case is that although defendant did not meet the burden of proof applied by that court with respect to the bona fide occupational qualification defense, § 4(f)(1) of the ADEA, 29 U.S.C. § 623(f)(1) on the evidence introduced, plaintiff was not automatically entitled to the protection, and defendant was not automatically subject to the prohibition of the age seventy (70) rule contained in 29 U.S.C. § 631(a). This is interpreted by the court as a salient inference that at some point age may be a bona fide occupational qualification for plaintiff Houghton.
>
> Whether plaintiff is still physically capable of qualifying for Chief Production Test Pilot is a question appurtenant only to plaintiff's abilities as extrapolated from age-related factors. [*Houghton v. McDonnell Douglas Corp., supra,* 474 F.Supp. at 194.]

1975.[11] This does not mean, as the appellants contend, that the court is barred from considering evidence of immeasurable impairments associated with age. Our prior opinion simply rejected the Company's proof of those impairments as insufficient.[12] Moreover, this court expressed no opinion whatsoever as to Houghton's qualifications as a test pilot subsequent to February 18, 1975. After that date, the question remained open for consideration by the district court.

We view Dr. Carter's testimony as multifaceted, tending to establish Houghton's physical disqualifications from flying as a production test pilot as well as attempting to prove a valid BFOQ applicable to production test pilots who reach fifty-two years of age. For reasons already stated, we need only examine this testimony and the trial court's findings of physical disqualification resting on it as they relate to the question before that court—*i. e.*, whether McDonnell Douglas proved that Houghton should not be reinstated after February 18, 1975.[13]

On February 18, 1975, Houghton had reached the age of fifty-five years and four months. The trial court's finding that Houghton was disqualified at age fifty-two also constitutes a determination by the district court that he was unable safely and effectively to perform the duties of Chief Production Test Pilot at the age of fifty-five years and four months and thereafter.

Dr. Carter's testimony supports this determination. Although referring to age fifty to fifty-five as a gray area or transition zone, he indicated that three studies furnished substantial support for a cutoff date at age fifty-five. In one study Drs. Routen and Reed found that performance at complex problem solving among subjects under age fifty clearly surpassed that of subjects over fifty-five; subjects between fifty and fifty-five turned in an intermediate performance. Dr. Carter next referred to a study of pilots' ability to assimilate new data. The study revealed that, when compared to pilots in their forties, pilots in the fifty-five to sixty age range took six to eight hours longer to learn how to master the Boeing 747 aircraft.[14] Finally, Dr. Carter testified from his review of the extensive studies underlying the age 60 rule for commercial pilots[15] that "[t]here's an upswing in just about everything above 55; stroke frequency, heart attacks, learning decrease, memory retention. All these things start to turn up pretty sharply at 55." Dr. Carter's testimony does not set a precise time for the increase in risk for test pilot safety and efficiency, but, as previously noted, that period generally comes after fifty-five.

Thus, Dr. Carter's testimony supports the determination of the district court denying reinstatement to Houghton after he had reached the age of fifty-five and four months. Accordingly, we hold that the dis-

---

11. *See* discussion at p. 865 *supra.*

12. The court specifically withdrew language which appeared to adopt the appellants' theory that all disabilities are measurable and predictable. *See* note 6 *supra.*

13. If the question had been open to the district court, we would be hard pressed to sustain the court's finding of disqualification at age fifty-two. Dr. Carter referred to aging of pilots in the lower fifties as a "gray area." *Houghton v. McDonnell Douglas Corp., supra,* 474 F.Supp. at 201–02. Moreover, Dr. Carter's personal opinion of a cutoff date at age fifty for a test pilot, although based upon his experience in examining thousands of pilots, lacks documentation and probably does not suffice to overcome the "*per se* violations" otherwise established, as noted in *Houghton I,* 553 F.2d at 564.

14. Appellants note that, once learned, the pilots performed the skill equally. Clearly, however, the amount of training time is a relevant consideration for the position of test pilot. Moreover, the study demonstrates a specific, age-related impairment in the abstract function.

15. The FAA's rule barring certification of commercial airline pilots after age 60 is codified at 14 C.F.R. 121.383(c) (1980). This rule has survived both procedural and substantive attacks. *See Rombough v. FAA,* 594 F.2d 893 (2d Cir. 1979); *Starr v. FAA,* 589 F.2d 307 (7th Cir. 1978); *O'Donnell v. Shaffer,* 491 F.2d 59 (D.C. Cir.1974); *Airline Pilots Association, International v. Quesada,* 276 F.2d 892 (2d Cir. 1960), *cert. denied,* 366 U.S. 962, 81 S.Ct. 1923, 6 L.Ed.2d 1254 (1961).

trict court did not err in denying reinstatement to Houghton.

## V. Conclusion.

The judgment shall award Houghton backpay for the period extending from termination of his flight pay in March 1972 to February 18, 1975, taking into account any likely increases in compensation during that period if Houghton had retained his position as Chief Production Test Pilot.[16] Houghton is entitled to tax attorneys' fees and costs in this extensive litigation in all federal courts—federal district court, this court, and in the Supreme Court. The EEOC is also entitled to costs in this litigation.[17]

---

16. We make no comment on the defense asserted by McDonnell Douglas that Houghton's damages should be reduced because he allegedly failed to mitigate his wage loss. This issue remains for consideration by the trial court.

17. At oral argument, appellants made some suggestion that this court itself make the award, considering that the case has now been tried twice. We decline to do so. Notwithstanding the tortuous history of this litigation, including reversals on the merits, we feel that the able district judge handling this case can be fair to all the parties. We remand the case to him for further proceedings. He may, in light of the history of this litigation, if he wishes to do so, transfer the cause to another judge of the district court for assessment of backpay, costs, and attorneys' fees.