**Gerry W. MONROE, et al., Plaintiffs,**

and

**Equal Employment Opportunity Commission, Plaintiff-Intervenor,**

v.

**UNITED AIR LINES, INC. and Air Line Pilots Association, International, Defendants.**

**Lee F. HIGMAN, et al., Plaintiffs,**

and

**Equal Employment Opportunity Commission, Plaintiff-Intervenor,**

v.

**UNITED AIR LINES, INC. and Air Line Pilots Association, International, Defendants.**

Nos. 79 C 360, 79 C 1572.

United States District Court,
N.D. Illinois, E.D.

May 16, 1983.

Supplement to Memorandum Opinion and Order May 24, 1983.

Edward Foote, Edward J. Wendrow, Winston & Strawn, Chicago, Ill., for defendant United Air Lines.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Following the trial of these bitterly-contested Age Discrimination in Employment ("ADEA") lawsuits, in which plaintiffs obtained a jury verdict of some $9 million—doubled to about $18 million because the jury found United Air Lines, Inc. ("United") had wilfully violated ADEA—individual plaintiffs' counsel have moved for an award of fees, costs and expenses and plaintiff-intervenor Equal Employment Opportunity Commission ("EEOC") has moved for an award of costs. For the reasons stated in this memorandum opinion and order fees, costs and expenses are awarded, but not in the full amount sought.

### Attorneys' Fees

There is no dispute as to the $895,472.98 "lodestar" figure covering fees for individual plaintiffs' counsel, for United has contested neither the time they spent nor the various hourly rates they request.[1] That limits the area of controversy (so far as fees are concerned) to whether any premium should be applied to the time spent by plaintiffs' lead co-counsel, Raymond C. Fay, Esq. ("Fay") and Alan M. Serwer, Esq. ("Serwer"). At lodestar figures their time charges represent some $635,000, more than 70% of the total time charges.[2] Plaintiffs' counsel ask for a 2.5 multiplier for the Fay-Serwer time, while United says no multiplier at all is appropriate.

One preliminary issue should be gotten out of the way first. Despite their agreement referred to in the preceding paragraph as to the proper hourly rates to be

Alan Serwer, Raymond Fay, Haley, Bader & Potts, Chicago, Ill., for plaintiffs.

Kathryn Kaluzny, E.E.O.C., Chicago, Ill., for plaintiff-intervenor.

1. See the attached January 19, 1983 letter from United's lead trial counsel, Edward L. Foote, Esq. to individual plaintiffs' counsel. Ex. 1. This Court has independently determined that the requested hourly rates (ranging from $125 per hour for lead counsel for the individual plaintiffs down to $85 for other lawyers and $35 for paralegals and law clerks) are certainly reasonable in relation to current market rates for legal services.

2. Fay spent more than 2,100 hours and Serwer just under 3,000 hours on these cases.

used in arriving at the lodestar figure, United's counsel have effectively tried to back into disputing the principal rate: They argue that a multiplier is inappropriate because the agreed-upon $125 hourly rate for Fay and Serwer already represents a "multiplier" of the $75 per hour rate that was originally referred to in the 1978 fee agreement between the first few plaintiffs and their counsel.[3] Because the reasonable hourly rate—*mutually agreed upon* as $125 —is the "convenient starting point,"[4] and not the end of the line, in the analysis whether a multiplier is appropriate, this Court will pause briefly to deal with United's invalid argument.[5]

Most courts (including our own Court of Appeals) considering fee awards in related contexts, usually under 42 U.S.C. § 1988, have consistently made plain that the proper test is not what a plaintiff's lawyer has charged *in fact,* but rather what the reasonable value of the lawyer's services is. That may arguably be a contradiction in free market terms, but it is one the courts have accepted. Losing civil rights defendants have not been successful in challenging awards to lawyers acting pro bono, or salaried lawyers, on the ground plaintiffs would not in fact have had to pay the amount of fees actually awarded. See, e.g., *Gautreaux v. Chicago Housing Authority,* 690 F.2d 601, 612–13 (7th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3583 (U.S. Jan. 31, 1983) (No. 82–1289). Were the rule otherwise, the civil rights violator would stand to obtain a windfall from the fact the plaintiff had to resort to a Legal Assistance Foundation lawyer or an ACLU volunteer lawyer. In another variant of the same concept, our Court of Appeals has recently rejected both the "bright prospects" standard and the notion that a contingent fee contract should serve "as an automatic ceiling on the amount of a [Section 1983 case] award." *Sanchez v. Schwartz,* 688 F.2d 503, 505 (7th Cir.1982), followed in *Lenard v. Argento,* 699 F.2d 874, 900 (7th Cir.1983), *petition for cert. filed,* 51 U.S.L.W. 3775 (U.S. Apr. 14, 1983) (No. 82–1692).[6]

No principled distinction seems reasonable between pro bono or salaried lawyers

**3.** Two footnotes at plaintiffs' R.Mem. 2 bear repeating here:

The purpose of the parties' stipulation was to save the Court and the parties the time-consuming exercise of examining all the factors which apply in determining the reasonable hourly rate. By entering into the stipulation, both sides willingly forewent the opportunity to argue that the base fee should have been higher or lower. For example, plaintiffs did not inquire into the hourly rates of defendant's attorneys which would have provided a "useful guide" to the Court in determining the base fee, *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d at 760, 768 n. 18 (7th Cir.1982), and which may well have resulted in a higher base fee. Giv[en] the mutual tradeoffs in the stipulation, United should not now be arguing for an effective reduction in the stipulated rate.

The $75/hr. rate alluded to by United was employed with the initial plaintiffs in 1978 and was retained throughout the case. When the majority of the plaintiffs joined the case pursuant to the Court's notice in 1981, they were represented at the same rate as the original plaintiffs so that the entire plaintiff group would be subject to uniform fee arrangements. This factor and other factors relating to inflation and delay in payment were accounted for in the stipulation regarding the reasonableness of the hourly rate, and

should not dilute the award of any multiplier deemed appropriate by the Court. We are puzzled by United's statement that the "exact nature of the contingency ... is not known" (opp. p. 4). United's counsel was provided a copy of the uniform fee agreement between plaintiffs and their counsel, and United inspected records of all client billings and receipts.

**4.** *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 764 n. 5 (7th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3025 (U.S. May 19, 1982) (No. 81–2135).

**5.** Just a month ago this Court treated the same subject (under the related provisions of 42 U.S.C. § 1988) in *Strama v. Peterson,* No. 78 C 2144 (April 8, 1983). Like Section 1988, 29 U.S.C. § 216(b) (incorporated by reference into ADEA, 29 U.S.C. § 626(b)) speaks of awarding a "reasonable attorney's fee." This opinion will plagiarize freely from *Strama.*

**6.** *Sanchez,* 688 F.2d at 505 confirms that what the lawyer may have *contracted* to charge does not control the court's decision as to the value of the services. That ruling alone should serve to reject United's current effort to undermine its own stipulation as to the reasonableness of the $125 rate.

(or for that matter, lawyers for large firms) on the one hand and lawyers like Fay and Serwer on the other, simply because the latter have opted for their kind of practice in a smaller Chicago office rather than for pro bono work or for the large firm practice to which their high-quality credentials would have given them entree. Under the facts of life in the law practice, Fay and Serwer have performed the bulk of their work at their firm (Haley, Bader & Potts) in cases where their clients could not guarantee the higher hourly tariff their counterparts in larger firms, representing deep-pocket clients such as United, can command.

█ Because the issue has been confronted by our Court of Appeals only inferentially, and because the matter is one of such wide-ranging applicability, this Court will risk laboring the subject a bit. In sum the operative principles line up this way:

1. Our search is for "a reasonable attorney's fee."

2. What is "reasonable" is *not* limited by what the individual lawyer involved has contracted to charge in the case in which fees are being awarded. *Sanchez; Lenard.*

3. What is "reasonable" is also *not* limited by what the individual lawyer charges in his or her practice generally. *Gautreaux.*

Accordingly one indicium of the "reasonable" fee *may* be the price the lawyer places on his or her services in this or other situations, but the cases have rejected that as the conclusive factor in ascertaining the market rate.

█ Consequently the agreed-upon $125 —realistic in terms of the current market— is indeed *Chrapliwy*'s "starting point" for determining whether a premium is appropriate and, if so, how much. With all deference our Court of Appeals does not provide

much assistance in that latter respect. Two things are plain from its opinions:

1. It does not like multipliers. It seldom approves them and, when it does, it usually cuts back on what has been allowed by the District Court that lived with the litigation. *See* its opinion of a month ago, *In re Congressional Districts Reapportionment Cases,* 704 F.2d 380 (7th Cir.1983); and its earlier opinion in *Kamberos v. GTE Automatic Electric, Inc.,* 603 F.2d 598, 603–04 (7th Cir.1979), *cert. denied,* 454 U.S. 1060, 102 S.Ct. 612, 70 L.Ed.2d 599 (1981).

2. As in both *Reapportionment Cases* and *Kamberos,* its own numbers are announced without a hint of their source. If we laborers in the District Court vineyards are to deal with the subject in a reasoned way, we ought to have more than a recital of the ABA Code of Professional Responsibility factors as announced in *Waters v. Wisconsin Steel Works,* 502 F.2d 1309, 1322 (7th Cir.1974), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976) (and regularly repeated since *Waters*), followed by a bottom-line conclusion that the District Court's multiplier is too high but another unexplained figure is not.[7]

This Court will try to bring to bear on the current problem its own recent experience in the practice as the senior active partner (and the principal billing partner) in a Chicago firm, familiar with (1) the "going rate" for lawyers of the skill and seniority of Fay and Serwer and (2) what the market is commanding where hours times usual hourly rates do not provide adequate compensation under the circumstances.

Plaintiffs' Memorandum describes very eloquently the size and steepness of the mountain their counsel set out to scale in these lawsuits. This Court will not lengthen this opinion unduly by rephrasing their accurate statement of the matter; it finds the factual recital correct and persuasive,

---

7. *Chrapliwy,* 670 F.2d at 769–70, appears to be an exception. There the Court of Appeals identified its concern that the District Court's "quality award" might provide double recovery once the Court of Appeals' restoration of high-

er base rates was given effect. At least as the opinion read, the District Court's continued "careful evaluation of the facts" (*id.* at 770) was likely to be viewed as an appropriate determination.

and it attaches that recital to this opinion as its own findings. Ex. 2. What plaintiffs' Memorandum perhaps does not stress sufficiently is that very early in the life of these actions Judge Flaum (to whom the cases were originally assigned) denied plaintiffs' motion for preliminary injunctive relief, holding they had *no reasonable likelihood of success on the merits*. Of course that was before plaintiffs' truly massive discovery efforts uncovered the kinds of evidence that were ultimately persuasive to the jury (and to this Court), but it underscores the uphill nature of the battle, the risks involved and—most significantly for current purposes—an important reason a meaningful premium is appropriate. This opinion turns, then, to the ABA Code factors approved in *Waters* and later cases.

1. *Time and Labor Required, Novelty and Difficulty of Questions Involved and Skill Required*

Simply to recite these criteria is to confirm their strong applicability here. These cases were extraordinarily difficult to prepare and try. Plaintiffs' counsel faced much larger teams of highly skilled lawyers (and, it may safely be wagered, far more highly compensated lawyers, at least as to the team leaders). These actions posed a host of novel problems with which the litigators and this Court (itself operating of course under the inverse multiplier applicable to the hourly rates of the federal judiciary) had to wrestle, right up through the jury instruction conference that had to plow considerable new ground.[8] Though this Court has not itself counted them, plaintiffs' Mem. 16 says more than 40 memorandum opinions and orders were issued during the course of the litigation, mostly in the discovery area.

It comes with ill grace for the loser, United, to denigrate these factors of difficulty and skill with the benefit of hindsight. These actions were hard-fought under hard

conditions. They took seven weeks of trial time and thousands of exhibits. And when word came that the jury had reached its verdict after a day's deliberations, and counsel and their clients had assembled in the courtroom for the dramatic moment of the verdict's return, it is fair to say neither the litigants nor their counsel were confident of what that verdict would be. United will not *now* be heard to underrate the difficulties plaintiffs' counsel overcame with real skill.

2. *Likelihood the Particular Employment Precludes Other Employment by the Lawyer*

Haley, Bader & Potts, the firm in whose small Chicago office Fay and Serwer are principal partners, has been forced by this litigation to curtail substantially its plans for which the Chicago office was established. These actions proved a very active tiger whose thrashing tail was being held by Fay, Serwer and colleagues. As United points out, Fay and Serwer have become experienced specialists in airline ADEA litigation, but that experience was bought in the high-risk climate of these lawsuits as already discussed. Because the litigation proved so demanding, the ability of the Chicago office to take on other employment as planned was inhibited in a major way.

3. *Fee Customarily Charged in the Locality for Similar Legal Services*

There are no truly "similar legal services" for purposes of comparison, for the combination of experience required for these actions is not found elsewhere. Without question $125 is at the low end of the spectrum for such activity, and though this Court has not been furnished the information (because of the parties' agreement on the $125 figure), it seems likely lead counsel for United (himself a highly-skilled practitioner) has almost certainly been compensated at a substantially higher rate.

---

8. At that time counsel and this Court were dealing with the applicability to these cases of the Court of Appeals' decision in *Hodgson v. Greyhound Lines*, 499 F.2d 859 (7th Cir.1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975). Since then *Orzel v. City of*

*Wauwatosa Fire Dep't*, 697 F.2d 743 (7th Cir. 1983), has made plain this Court, in adapting *Hodgson* to these cases, gave United the benefit of having imposed a heavier burden on plaintiffs than *Orzel* would require.

### 4. Amount Involved and Results Obtained

This speaks for itself. In addition to the *very* large $18 million award, this Court has ordered reinstatement for all individual plaintiffs who wanted it, and questions of further relief (such as pension benefits) are still in litigation.

### 5. Time Limitations Imposed by Clients and Circumstances

Every step of the way was battled vigorously, reflecting a classic example of what Judge Will of this District Court refers to as the "Stalingrad defense." Time was plaintiffs' enemy. They wanted to be restored to active service, and they had been terminated because of age. Their prospects of reinstatement would necessarily dim with greater age and prolonged inactivity. As a result of that and other factors, both sides were subjected to a crash program of discovery of truly enormous proportions to meet a firm trial date established by this Court.

### 6. Nature and Length of Professional Relationship with Clients

This was not a factor.

### 7. Experience, Reputation and Ability of the Lawyers

Both Fay and Serwer, though younger lawyers by this Court's standards, had impressive experience and reputations. They handled themselves with great ability against opposing forces of great ability (and whose experience and reputation were greater than those of Fay and Serwer). This Court will not repeat their credentials,

for they are not in dispute and can again be adduced by Fay and Serwer if this award is appealed.

### 8. Whether the Fee Is Fixed or Contingent

Pilots and Second Officers are highly paid. Consequently plaintiffs' counsel were not subjected to total contingency employment. Nonetheless their clients were not prepared to undertake open-ended commitments, and the contractual fee agreements they entered into provided plaintiffs' counsel with a limited pool of funds of $2,000 per plaintiff.[9] Thus recovery of *most* of the fees and expenses was contingent on success.

\*     \*     \*

■ Taking all the factors into account, this Court has determined a substantial premium is indeed appropriate. It uses the concept of a premium rather than a "multiplier" advisedly. One fact the courts never seem to discuss in these cases (perhaps most judges have not recently been in the billing business) is the obvious one that hourly rates cover overhead as well as compensation for services.[10] Though the margins vary widely from firm to firm, a fair rule of thumb is to consider that $1 of a lawyer's billing covers $.50 of overhead and $.50 of compensation and profit. Thus a simple multiplier, where there is after all no increased overhead to cover, generates pure profit and multiplies that profit out of all proportion to the *apparent* number the multiplier represents.[11]

---

9. Ultimately the opting-in of individual plaintiffs other than the original few generated a total fund of $223,000, providing partial coverage of the fees and expenses. Though that amount looks large in retrospect, matters were very chancy when these suits began with only a few plaintiffs. It took a victory in the form of this Court's ruling that an opt-in notice could be sent, coupled with a favorable response to that notice, to bring counsel the assurance of any meaningful amount.

10. As to the non-overhead portion, fees shared by the law firm's partners may be viewed either as higher compensation for their services or—perhaps with greater accuracy—as also reflecting their entrepreneurial return for their investment of capital and their risk-taking commitments of the practice (such as personal liability on the typical long-term lease of space, hiring *commitments* involving lawyer associates as well as other personnel, and so on).

11. If the 50–50 ratio applies, a rate multiplier of 2 actually multiplies the compensation-profit factor by 3; a rate multiplier of 3 multiplies the compensation-profit factor by 5. Although our Court of Appeals did not articulate that consideration, its most recent rejection of a multiplier of 3 applied to an hourly rate of $165 (contrasting that with the same multiplier times a $100 hourly rate) may reflect an intuitive recognition that the straight application of multipliers can generate such unfair results. *Reapportionment Cases,* at 383–384.

In any event, this Court finds a $75 per hour premium is both reasonable and appropriate, raising the hourly rate for Fay and Serwer to $200 (expressed in the misleading multiplier terminology, that would be 1.6 times the $125 base rate). That ultimate $200 rate is not at all out of line in today's market [12] and is surely moderate under all the circumstances already discussed. That means an addition to the $895,472.98 lodestar figure of $381,217.50 (5,082.9 hours times $75), for a total fee award of $1,276,690.48.

*Individual Plaintiffs' Costs and Expenses*

Counsel for individual plaintiffs have meticulously separated out the amounts allocable to these cases from amounts spent on all the airline ADEA cases in which they have been involved. United does not object to items 1, 2, 3, 4, 6 and 16 in plaintiffs' itemization, or to parts of items 5 and 13. It does however object to the other requested items as outside the conventional "costs" awarded in litigation.

This Court has dealt with the limited concept of taxable costs on a number of occasions, usually not in printed opinions (*Ingersoll Milling Machine Co. v. Otis Elevator Co.,* 89 F.R.D. 433 (N.D.Ill.1981) is an exception). Plaintiffs correctly point to case law (though none of the cases that have dealt with the question are in our Circuit) that teaches a wholly different notion applies in civil rights actions generally and ADEA cases in particular, where Congress has seen fit to provide for the shifting of cost.[13] *Dowdell v. City of Apopka,* 698 F.2d 1181, 1188–89 (11th Cir.1983); and *see also* such cases as *Thornberry v. Delta Air Lines, Inc.,* 676 F.2d 1240, 1244–45 (9th Cir. 1982), *petition for cert. filed,* 51 U.S.L.W. 3099 (U.S. Aug. 2, 1982) (No. 82–192); *Jones v. Diamond,* 636 F.2d 1364, 1382 (5th

Cir.), *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981); *Northcross v. Board of Education of Memphis,* 611 F.2d 624, 639–40 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980); *Wheeler v. Durham City Board of Education,* 585 F.2d 618, 623–24 (4th Cir. 1978); *Greene v. Whirlpool Corp.,* 538 F.Supp. 352, 357 (W.D.N.C.1982); *Vulcan Society of Westchester County, Inc. v. Fire Dep't of City of White Plains,* 533 F.Supp. 1054, 1067 (S.D.N.Y.1982); *Combes v. Griffin Television, Inc.,* 421 F.Supp. 841, 847 (W.D.Okl.1976).

■ Because the premium for fees arrived at by this Court earlier in this opinion did *not* allow for any increased overhead beyond the norm, and because the items claimed by plaintiffs are indeed outside the norm of mine-run overhead, this Court finds the thrust of the cited cases persuasive. Plaintiffs are therefore awarded the full $48,808.20 they have requested for taxable costs *and* other reasonably incurred out-of-pocket expenses.

*EEOC's Costs*

■ EEOC has filed a bill of costs for $81,287.71. United does not quarrel with the amount involved and does not dispute that the claimed costs were reasonably and necessarily incurred. Instead it disputes the entire idea EEOC, as a government agency intervening as plaintiff, is entitled to an award of costs at all.

EEOC's claim is not under ADEA's special statutory provision for costs but under 28 U.S.C. § 2412(a):

> Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of

---

**12.** Anyone who continues to be in touch with the ongoing escalation in the cost of lawyering is aware that $200 per hour (once an unthinkable number) is no longer unusual for highly skilled, high quality (and highly successful) representation. It may also be noted that the principal counsel in *Reapportionment Cases* (since then reprimanded by the Court of Appeals for dilatory action in another case, a

repeated manifestation of his being spread too thin) had an approved base rate of $165 and an approved rate, with the 20% premium, of $198.

**13.** In such circumstances expenses not specifically taxable as costs are sometimes viewed as part of the allowance of a "reasonable attorney's fee."

attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action.

United's semantic argument that these actions were not "brought by" EEOC ignores the realities that, as EEOC's R.Mem. 2 says:

At the time the Commission sought to intervene in the *Higman* case, there were three Plaintiffs. The case was like David and Goliath, three former employees suing the largest airline in the free world. The entry of the Commission in the case balanced the scales and enabled the parties aligned against the Age 60 Policy to do the massive discovery necessary to meet United's defenses.

EEOC has been the lead plaintiff on the subject of injunctive relief. In the most meaningful sense these actions were brought by EEOC just as much as by individual plaintiffs (indeed United argued during the later stages of the litigation that the individual plaintiffs' claims must be *dismissed* because EEOC's presence had effectively converted these actions into suits brought by the government, a not even specious argument rejected by this Court).[14]

For current purposes these civil actions may be considered as though brought by an agency of the United States. EEOC's claimed costs are not duplicative of those allowed to the individual plaintiffs. It is awarded the full $81,287.71 encompassed by its request.

### Conclusion

United is ordered to pay the sum of $1,325,498.68 to plaintiffs' counsel as attorneys' fees, costs and expenses, and the sum of $81,287.71 to EEOC as costs, on or before May 31, 1983.

### EXHIBIT 1

## WINSTON & STRAWN

SUITE 5000

ONE FIRST NATIONAL PLAZA

CHICAGO, ILLINOIS 60603

(312) 558–5600
TWX 910–221–5467
TELECOPIER (312) 558–5683

WASHINGTON, D. C. OFFICE
2500 M STREET, N. W.
WASHINGTON, D. C. 20037
(202) 828–8400

FREDERICK H. WINSTON (1853–1886)
SILAS H. STRAWN (1891–1946)

EDWARD L. FOOTE
(312) 558–5601

January 19, 1983

Mr. Raymond C. Fay
Haley, Bader & Potts
77 West Washington Street
Suite 1616
Chicago, Illinois 60602

Dear Ray:

I acknowledge your letter and enclosures of January 18, 1983. As you know, I will probably be out of the office next week and I therefore thought it would be helpful to answer your letter promptly.

*First.* I will recommend to the client that we stipulate to your hourly rates as set forth in the second paragraph of your letter of January 18.

*Second.* We do not intend to examine the time that you have spent line-by-line but I have asked our staff to sample the time statements. In that connection,

---

14. Though this opinion does not rest on estoppel grounds, it *is* ironic to find United advancing an argument of precisely the opposite thrust now, when it suits its advantage.

your office will hear from Bob Hermes or Marguerite Strubing regarding that sample verification.

*Third.* It is my intention, subject to that view, to recommend to the client that we stipulate to the hours expended so that we will not have to have a hearing on that data.

Since this may affect the Court's scheduling, I am taking the liberty of sending a copy of this letter to the Honorable Milton I. Shadur.

Very truly yours,
/s/ Edward L. Foote

ELF:mv
cc: Honorable Milton I. Shadur

EXHIBIT 2
FACTUAL PERSPECTIVE

Plaintiffs will attempt to summarize the background, history, and effect of the nearly four years of this litigation as they may impact on the appropriateness of their request for fees.

Although the FAA's Age 60 Rule has been a matter of considerable controversy since its inception in 1960, little of consequence had been accomplished to overturn or modify the Rule until the past several years. And although the Rule never applied to flight engineers, airlines including United have applied an analogous age limitation to their flight engineers in conjunction with "normal retirement ages" in pension plans. Until April 6, 1978, United and many other airlines retired all cockpit crewmembers at age sixty, referring either to the terms of their pension plans, to the FAA's Age 60 Rule, or both.

When the ADEA was amended in April 1978, the pension plan exception was no longer available. As evidenced at trial, United shifted its reliance to the Age 60 Rule, together with what it viewed as the factual underpinnings of the Rule, to support a continuation of the mandatory retirement policy which had begun with its earliest pension plan in the 1940's.

Beginning in April 1978, and continuing over the next twelve months, a small nucleus of United's flight engineers and, separately, an equally small number of United Captains, joined together to contest what they regarded as a violation of their right to be free of age discrimination in their employment, and their right to continue working so long as they could meet United's standards and requirements other than age.

The flight engineer group, led by Gerry Monroe, Kenneth Kuecker, and John Kalde, retained Haley, Bader & Potts to institute litigation and to file a motion for preliminary injunction in an effort to keep them working during what was expected to be extensive litigation. The complaint was filed on January 31, 1979.

The Captain group, led by Lee Higman, John Campbell, and Sylvanus Devine, coordinated with groups of pilots on other airlines, including Northwest, Braniff, TWA, Eastern, and Western (later joined by pilots on American and Continental) in bringing ADEA actions against their respective employers so that they, too, could continue their employment without respect to age. Their complaint was filed on April 10, 1979.

Recognizing the gross disparity of resources between a few retired pilots and major trunk airlines like United, and viewing the ADEA violations, aircraft types, crew positions, duties, and airline operations as substantially identical, their initial efforts had two aims. First, the crewmembers decided to bring ADEA representative actions in the hope that additional similarly situated crewmembers would pool their knowledge and resources to permit a fair contest against both the respective employer airlines and a hostile union representing the economic interests of a junior membership. Second, they brought all the actions in the Northern District of Illinois and immediately moved to consolidate the cases for trial. Plaintiffs in all of these actions were represented by Haley, Bader & Potts.

Plaintiffs' efforts were only partially successful. Although the representative ("class") aspects of the action provided by statute were not foreclosed, the Court (Judge Grady) declined to consolidate the actions and most were ultimately transfer-

red to the judicial districts in which the respective airlines' headquarters were based.* Later, a motion before the Judicial Panel on Multidistrict Litigation to transfer and consolidate for discovery was denied. Thus, the economies of consolidation were not achieved, and the risks from an economic standpoint of sustaining the litigation were great indeed.

Thus began the arduous road culminating in the trial of these actions for seven weeks in August and September 1982. From the beginning, the cases were novel, protracted, and thoroughly litigated. The proceedings in the litigation included:

1. Class action counterclaims for declaratory relief, including the joinder of employees not parties to the litigation as defendants to the counterclaims.

2. Motion for preliminary injunction.

3. Extensive discovery under Federal Rules 33 and 34, most of which was contested, resulting in the production of hundreds of thousands of documents by United, including personnel and training files, accident reports, incident summaries, and documents concerning substantially all aspects of its flight operations. As United pointed out in its Memorandum in Support of Motion to Compel Compliance (Aug. 6, 1981), "plaintiffs have served ... discovery demands requesting voluminous information and documentation about virtually every phase of United's Flight, Training and Personnel practices and policies." (Mem. at 5).

4. A vigorously contested dispute over United's assertedly privileged "49 documents," resulting in the Court reversing the Magistrate's determination and ordering disclosure of key internal United documents revealing a plan to lead the industry ("spearhead") in pursuing action to extend the Age 60 Rule to the flight engineer position. Litigation over "Document 22" was particularly contested, with plaintiffs ultimately succeeding in obtaining production following the Court's reconsideration of its earlier denial of plaintiffs' motion.

5. Plaintiffs' motion for a court-approved notice to a "class" of similarly situated employees was granted over vigorous opposition by United. The Court's opinion was later relied on by courts in other ADEA actions, including *Johnson v. American Airlines, Inc.*, 531 F.Supp. 957 (N.D.Tex. 1982); and *Allen v. Marshall Field & Co.*, 93 F.R.D. 438 (N.D.Ill.1982). A similar ADEA notice was subsequently approved in *Woods v. New York Life Insurance Co.*, 686 F.2d 578 (7th Cir.1982).

6. Litigation over United's medical files and disclosure of the names of affected crewmembers was particularly intense, including United's attempted mandamus action to the Seventh Circuit Court of Appeals, as well as its false and incomplete responses to discovery, resulting in the imposition of sanctions by the Court on November 5, 1981. The outcome resulted in a seven-month undertaking by plaintiffs' counsel, beginning in January 1983, to review the medical file of every United flight crewmember who had received an exemption, had become incapacitated in flight, had three proficiency failures within a given period, had a "special issue" certificate, or had been medically grounded since 1938. This effort, though arduous, was essential to the presentation and cross-examination of witnesses on the

---

* The exceptions were actions against Western, Northwest Airlines, and one of the actions against American Airlines. The Western action is no longer pending and the American case was later transferred to the Northern District of Texas on plaintiff's motion. The action against Northwest is now pending before Judge Nordberg. *Neuman v. Northwest Airlines, Inc.*, No. 79 C 1570.

medical-aging issues in this litigation.

7. Extensive efforts under Fed.R.Civ.P. 26(f), resulting in an Order dated March 4, 1981 limiting the issues and requiring plaintiffs to complete all United management depositions on an abbreviated intensive schedule. As United commented, "[i]n the months of May, June and July [1981], most business days were occupied in the deposition by plaintiffs of United officials." (Memorandum in Support of Motion to Compel Compliance at 5).

8. Plaintiffs' response to an extensive Motion for Summary Judgment which was supported by argumentative affidavits not in compliance with the Federal Rules.

9. The official docket sheet in the *Monroe* case reflects 2000 entries as of January 19, 1983. Plaintiffs conducted 70-½ days of depositions, including twenty-eight depositions of United's management, three of its experts, and eleven of ALPA officials and third party witnesses. This includes the three-day deposition of ALPA's medical advisor, Dr. Masters, which prompted substantial disputes as to Dr. Masters' status as an ALPA employee, his ability to testify on matters relating to the National Academy of Sciences, and the scope of the proposed examination. United took depositions from 66 plaintiffs.

10. Plaintiffs filed 116 memoranda of law in these cases. There were 65 substantive motions filed in *Monroe* alone (excluding routine motions for leave to file documents or extensions of time), and the Court issued 48 written opinions.

11. United utilized twenty-one attorneys in the preparation and presentation of its case.** The Air Line Pilots Association used eight.***

12. The 33 days of trial from August 16 through September 29, 1982 (including jury selection, instruction conferences, and verdict) was, as best can be determined by counsel, the longest jury trial with the greatest number of plaintiffs ever conducted under the ADEA. The trial transcript is 6,872 pages. Over 2,000 exhibits were identified and marked by the parties. (United marked 1090; plaintiffs marked 995). The Court admitted 345 exhibits in evidence (272 for plaintiffs; 73 for United).

13. The jury verdict was the largest in the history of the ADEA (based on reported and unreported decisions available to counsel). The relief already granted and likely to be granted in the future alters a practice which has existed for over forty years, and provides extended employment opportunities to a workforce of five thousand or more flight deck crewmembers. The effect on the air carrier industry is incalculable, since this case was the keynote case in the nationwide, industrywide dispute over whether the ADEA requires air carriers to allow flight engineers to work beyond age sixty.

## SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

By sheer coincidence this Court's May 16 memorandum opinion and order (the "Opinion") dealing with the award of attorneys' fees and other expenses to plaintiffs' counsel was issued the same day the Supreme Court announced its definitive opinion on

---

** *Winston and Strawn:* E. Foote, T. Campbell, J. Stack, C. Sawyier, R. Hermes, E. Wendrow, and K. Anderson; *Poletti, Freidin:* H. Prashker, B. Cohen, S. Futterman, S. Sawyer, C. Minuse, N. Weiskopf, W. Hickman, B. Dixon, F. Moss, and B. Lee; *United Air Lines:* P. Hogan, E. Dolan, E. Hoenicke, and T. Fraser.

*** *Cohen, Weiss and Simon:* M. Abram, J. Levy-Warren; *Katz, Friedman:* M. Erp, H. Katz, I. Friedman, N. Tripp, A. Hodges; *ALPA:* C. Goldstein.

attorneys' fees under 42 U.S.C. § 1988 in *Hensley v. Eckerhart*, —— U.S. ——, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).[1] This supplement is intended to reflect the impact of *Hensley* on the Opinion.[2]

Though *Hensley* was a five-to-four decision, there is a wide range of agreement between its majority and the dissenters. In any case the Court's majority opinion is wholly consistent with the principles expressed and applied in the Opinion, requiring discussion of only one possible minor exception.

By way of emphasis and exposition it is worth quoting the operative principles from *Hensley*, at ——, ——, ——, 103 S.Ct. at 1939, 1940, 1941:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.
>
> \*   \*   \*   \*   \*   \*
>
> The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained."
>
> \*   \*   \*   \*   \*   \*
>
> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.
>
> \*   \*   \*   \*   \*   \*

We reemphasize that the district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters. It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award. When an adjustment is requested on the basis of either the exceptional or limited nature of the relief obtained by the plaintiff, the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained.

All those statements appear to this Court to support the analysis and conclusions of the Opinion, and this Court accordingly reaffirms both its reasoning and the results reflected in the Opinion.

One possible question is raised by *Hensley*'s discussion and analysis: the allowability of the 94.75 hours (representing $18,950 of total fees, based on the $200 hourly rate approved in the Opinion) spent in plaintiffs' losing effort to obtain a preliminary injunction at the outset of this litigation in January 1979. *Hensley* speaks (*id.* at ——, 103 S.Ct. at 1940) of "partial or limited success" as a basis for reducing compensable services. But it does so in two contexts:

1. "distinctly different claims for relief that are based on different facts and legal theories" (*id.*), as to which it goes on to say (*id.*):

> In such a suit, even where the claims are brought against the same defendants—often an institution and its officers, as in this case—counsel's work on one claim will be unrelated to his work

---

**1.** Several of the decisions cited in the Opinion have been pending on petitions for certiorari (some for unusually long periods): *Chrapliwy* (see Opinion 276 n. 4), *Gautreaux* (Opinion 276–277), *Lenard* (Opinion 276–277) and *Thornberry* (Opinion 280). This Court has assumed the Supreme Court has retained those petitions without disposition because of the pendency of *Hensley*.

**2.** As *Hensley* said, *id.* at —— n. 7, 103 S.Ct. at 1939 n. 7:

> The standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a "prevailing party."

on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." *Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444, at 5049 (C.D.Cal.1974). The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

2. "claims [that] were interrelated, nonfrivolous, and raised in good faith," as to which "Again, the most critical factor is the degree of success obtained" (*id.*).

█ Neither of those conditions for reduction applies here. Plaintiffs' unsuccessful motion for preliminary injunctive relief was based on the identical "facts and legal theories" that underpinned their ultimate success on the *merits.* That appears to this Court to implicate the earlier-quoted *Hensley* language stating (*id.*):

> In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.

And as for the alternative, plaintiffs scarcely can be said to have obtained less than a total "degree of success," for their back pay award (doubled because of wilfulness) coupled with reinstatement has given them everything the preliminary injunction would have provided. No different result is compelled by the Supreme Court's earlier reference (*id.*) at ——, 103 S.Ct. at 1939 to one of the cases cited approvingly in the Senate Report preceding enactment of Section 1988, *Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974), *aff'd,* 550 F.2d 464 (9th Cir.1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

In this Court's view *Hensley* thus confirms the results announced in the Opinion. Consequently the Opinion and its concluding order remain unmodified.